[No. G042073. Fourth Dist., Div. Three. July 30, 2010.]

RUDY MIRANDA et al., Plaintiffs and Appellants, v.
BOMEL CONSTRUCTION CO., INC., et al., Defendants and Respondents.

COUNSEL

Perona, Langer, Beck & Serbin, Ronald Beck and Ellen R. Serbin for Plaintiffs and Appellants.

Trachtman & Trachtman, Kevin L. Henderson, Ryan M. Craig; and Ronald P. Kaplan for Defendant and Respondent Bomel Construction Co., Inc.

Collins Collins Muir & Stewart, Brian K. Stewart, Douglas Fee, Joe A. Bollert and Christian E. Foy Nagy for Defendant and Respondent J/K Excavation & Grading Co., Inc.

OPINION

O'LEARY, J.—Rudy Miranda worked as a locksmith at a university campus in Fullerton. His office was located next to a vacant lot, used in 2005 for stockpiling excess dirt from a large construction project. Miranda contracted the infectious fungal disease coccidioidomycosis, commonly called "Valley Fever." He sued general contractor, Bomel Construction Co., Inc. (Bomel), and subcontractor, J/K Excavation & Grading Co., Inc. (J/K). Miranda's general negligence complaint alleged Bomel and J/K "negligently, carelessly and unlawfully allowed the 'excavated dirt to be in a dangerous, defective, and unlawful condition so as to cause [Miranda] to sustain severe injuries and damages when he breathed the injurious particles from the excavated dirt." Miranda's wife, Donna Miranda (Donna), sued for loss of consortium.

The trial court entered summary judgment in favor of Bomel and J/K, concluding they did not owe a duty to protect Miranda from exposure to the fungus, and it could not be established they proximately caused Miranda's or his wife's injuries. We conclude the court was right and affirm the judgment.

I

Bomel contracted with the Trustees of the California State University to construct a six-story parking structure on the California State University, Fullerton (CSUF) campus. Bomel agreed to excavate, remove, and dispose of all dirt not necessary for the project, known as the "PS2 project." Bomel hired J/K to excavate approximately 1,600 cubic yards of dirt from the PS2 project site and transport it to a vacant lot on the campus, known as "Dumbo Downs." Miranda's locksmith shop was located approximately 10 to 15 feet away from Dumbo Downs.

Construction started during the school's spring break in 2005 and ended 14 months later. On May 26, 2005, J/K deposited 1,600 cubic yards of the PS2

project's dirt on Dumbo Downs. This stockpile of dirt was approximately 100 feet deep, 80 feet wide, and 10 feet high. Thereafter, other contractors and subcontractors working on different construction projects also deposited dirt on Dumbo Downs.

For approximately three months, from May 27 to September 1, 2005, the dirt pile was watered down only once. It was not sprayed with polyurethane or otherwise covered until September 2, 2005.

Miranda began exhibiting symptoms of coughing, fatigue, difficulty breathing, fever, and body aches in August 2005. Over time his condition worsened, and in 2006, he underwent surgery to remove a portion of his left lung. The pathology report confirmed the existence of Valley Fever.

At the end of April 2007, Miranda and his wife (hereafter referred to collectively and in the singular as Miranda) filed a complaint for negligence and loss of consortium against Bomel and J/K. In November 2008, Bomel and J/K each filed a motion for summary judgment, both asserting (1) they did not owe Miranda a duty to protect him from the exposure to an airborne fungus; and (2) Miranda would not be able to prove causation as a matter of law due to the nature of the disease caused by inhalation of airborne fungal spores endemic to a large portion of California. Bomel and J/K jointly submitted the expert declaration of Ben Kollmeyer, a certified industrial hygienist, who provided information on the nature of the fungus and the mode of infection.

Kollmeyer declared, "Valley Fever is also known as coccidioidomycosis and caused by a fungus known as *Coccidioides immitis* (the '*Cocci* fungus')." He explained, "Persons can become infected with the *Cocci* fungus by inhaling fungal spores that become airborne after disturbance of contaminated soil by humans or natural disasters, e.g., dust storms, earthquakes, wildfires and manmade activities. [¶] . . . Any manmade activity or event which occurs on virgin (undeveloped) soil can create dust. This has the potential of disturbing spores of the *Cocci* fungus, if spores are present in the soil . . . and may occasionally result in infections, not only to the people participating in the activity but also to other people in the area at the time of the activity. These activities include agricultural work, land development and construction, mining, dusty recreational activities, vehicles on unpaved roads, home gardening, and landscaping."

Kollmeyer declared the fungus spores can travel great distances. He stated, "Strong winds can carry spores of the *Cocci* fungus for hundreds of kilometers. Therefore, in certain circumstances infection can be spread well outside of recognized endemic areas. For example, strong winds during a storm in

Kern County, California carried the *Cocci* fungus spores 500 kilometers north to the vicinity of Sacramento, California (infecting as many as 7,000 people in Sacramento County)." Kollmeyer attached scientific articles and reports supporting these facts.

In addition, Kollmeyer declared, "The *Cocci* fungus is hyperendemic in Kern County and areas of the San Joaquin Valley, where almost one third of the population tests positive for exposure. Additionally, the *Cocci* fungus is endemic to other arid and semi-arid areas of [S]outhern California. According to the Center for Disease Control[,] of people who live in an endemic region, about 10–50 [percent] will have evidence of exposure. For the year 2005, public health agencies in the respective counties reported 1.3 infection cases per 100,000 persons in Orange County, California and 2.23 cases per 100,000 persons in Los Angeles, California." Kollmeyer attached documentation also supporting these statistics.

Finally, Kollmeyer opined, "Since a Valley Fever infection is almost always the direct result of inhalation of airborne spores of the *Cocci* fungus, the exact source (home, recreation, work, travel, etc) of the exposure cannot be determined absent scientific data, e.g., soils tests, confirming the existence of the *Cocci* fungus in the soil at issue at the time of exposure." In rendering his opinion, Kollmeyer relied heavily on a report prepared by employees of the U.S. Geological Survey (USGS) and the School of Medicine at the University of California, Davis, discussing the characteristics of the disease and providing risk management strategies for workers performing geological fieldwork in areas endemic for Valley Fever. This scientific report included a detailed description of the endemic areas, and the character of the disease. It supported Kollmeyer's conclusion detection of coccidioidomycosis (*Cocci*) fungus requires scientific data: "The presence of [*Cocci* fungus] in specific areas is determined by direct sampling of soils, identification of positive skin and serologic tests in non-mobile human populations, and recognition of the infection in humans and animals (mostly dogs)."

The USGS study also revealed that large numbers of people are exposed to the fungus spores and are infected, but very few people contract the more serious form of the disease. "Most people who are long-term residents (several years) in areas where [*Cocci* fungus] is present are exposed to [the spores] of the fungus and are consequently infected. About 60 percent of the people infected are asymptomatic, their exposure to the infection being reflected only by a positive . . . skin test. Most symptomatic cases result in primary infection with relatively mild cold or influenza-like symptoms . . . [and] in some cases there may be pneumonia. In about [one] percent of those infected . . . [there are] fatal results." The authors of the report concluded, "Clearly, dust control measures are the main defense against infection.

However, it is important to note that dust itself *is only an indicator that* [*Cocci* fungus spores] may be airborne in a given area and that some dust clouds may be completely free of [it]. . . . [The spores], whose size is well below the limits of human vision, may be present in air that appears relatively clear and dust free. Such ambient, airborne [spores] with their low settling rates can remain aloft for exceedingly long periods and be carried hundreds of kilometers from their point of origin." (Italics added.)

Miranda filed an opposition to the summary judgment motions and objected to portions of Kollmeyer's declaration as reaching beyond the scope of his expertise. In his opposition, Miranda argued Bomel and J/K owed a duty to protect Miranda from his exposure to dust inhalation, and causation was a triable issue of material fact. The motion was supported by declarations from four expert witnesses: Theo Kirkland, Nachman Brautbar, Daniel Napier, and Dan Rosen.

Theo Kirkland, a physician, had written peer-reviewed articles on Valley Fever. He agreed Valley Fever was caused by the *Cocci* fungus that grows as a mold in the soil and is endemic to Southern California, including Fullerton. He opined that since the fungus infects humans by entering the lungs, "Exposure to dust from soil is a critical factor in determining the risk for infection of Valley Fever. [Citation.] As a result, manmade activities, such as the stockpiling of uncovered dirt which creates dust that is released into the air and is inhaled by persons, will significantly increase the risk of acquiring the disease." He also noted, "the absence of any testing for the [*C*]*occi* fungus at any given location does not preclude a physician from rendering an opinion, to a reasonable degree of medical probability, that exposure from a certain source of dust from soil was a substantial factor in causing a person's Valley Fever. This is because the [*C*]*occi* fungus is endemic to Southern California." Kirkland stated that assuming the information regarding Miranda's work location and time of exposure were true, "it is my opinion, to a reasonable degree of medical probability, that . . . Miranda's exposure to the dust from the stockpile of dirt . . . was a substantial factor in causing [his] Valley Fever."

Similarly, Miranda's treating physician in his workers' compensation case, Nachman Brautbar, described Valley Fever as being caused by the *Cocci* fungus found in the soil and it infected humans by entering the lungs. He noted, "CSUF and its insurance carrier have accepted . . . Miranda's claim that his Valley Fever was caused by his occupational exposure to dust from soil from an area on the campus of CSUF."

Brautbar also discussed the nature of the disease. He stated, "Exposure to dust from soil is a critical factor in determining the risk for infection of

Valley Fever. As a result, manmade activities that create dust from soil will significantly increase the risk of the disease in endemic areas. [¶] . . . The incubation period for Valley Fever (the time from exposure to the appearance of symptoms) is approximately [one to four] weeks." Based on his background, the medical and scientific literature, Miranda's medical records, and the undisputed facts of the case, Brautbar stated, "[I]t is my opinion, to a reasonable degree of medical probability, that . . . Miranda's exposure to the dust from the approximate 1100 to 1600 cubic yards of dirt stockpiled at Dumbo Downs was a substantial factor in causing [his] Valley Fever."

Daniel Napier, a certified industrial hygienist, discussed the general construction practices for contractors, including the safe storage of soils. Based on his review of deposition testimony, Napier determined, "J/K and Bomel were required to implement dust control for the stockpile at Dumbo Downs," but they failed to appropriately water or cover the dirt from May 26, 2005, to September 1, 2005. He noted the dirt pile was watered only one day, June 6, 2005. Napier noted there was deposition testimony confirming dust from the stockpile traveled to surrounding areas beyond Dumbo Downs, and there were dust problems in the locksmith shop where Miranda worked.

Napier stated he was "aware of state and local regulations that require contractors to reduce the amount of fugitive dust in the ambient air. For example, under the South Coast Air Quality Management District ('AQMD') 'Rule 403. Fugitive Dust,' contractors are required to 'reduce the amount of particulate matter entrained in the ambient air as a result of anthropogenic (man-made) fugitive dust sources by requiring actions to prevent, reduce, or mitigate fugitive dust emissions.' [Citation.]"

Napier explained, "This regulation is health-based because particulate matter from fugitive dust can cause health problems including 'aggravated asthma, heart, or lung disease,' 'chronic bronchitis,' and 'premature death.' [Citation.]" Based on his experience and training, Napier opined "the standard of care for general construction practices relating to the stockpiling of dirt requires that contractors either (1) spray the stockpiled dirt daily with water, (2) fully cover the stockpiled dirt, or (3) spray a chemical suppressant on the stockpiled dirt to prevent fugitive dust. These requirements are necessary to prevent persons from being exposed to such contaminants as fungi, bacteria, and carcinogens, which can cause serious illness and the increased risk of cancer." Napier also opined: (1) Bomel's and J/K's failure to stabilize the stockpile substantially deviated from the South Coast Air Quality Management District (AQMD) rules; (2) Bomel's and J/K's failure to implement dust control measures substantially deviated from and violated the standard of care for general construction practices; and (3) the failure to implement dust control measures caused excessive visible dust problems in

Miranda's shop and surrounding areas, and "was a substantial factor in increasing [his] risk of contracting Valley Fever."

Finally, Napier refuted Bomel's and J/K's claims to have had no knowledge of Valley Fever or its presence in Orange County. Napier stated those contractors "should have known" because "it has been long established that the [C]occi fungus is endemic in Southern California and that activities that create dust from soil such as construction will increase the risk of the disease." Napier stated he has personally been aware of the risks of *Cocci* fungus since 1982.

Dan Rosen is a licensed general contractor who has worked in the business for over 30 years. He offered his opinion on the standard of care of general contractors and subcontractors in the transportation and storage of dirt on construction sites. He stated, "Covering of a dirt pile of excavated soil has been for as long as I have been in the business a common, standard, and required practice in the building industry." Rosen reviewed the depositions and the parties' contracts concerning the PS2 project and he concluded J/K "was under a contractual obligation to supply and maintain a dust control system during the course of their work for Bomel . . . . In addition, Bomel and J/K were paid and agreed to cause the covering of the Dumbo Downs dirt during the May-September 2005 time period."

Rosen also discussed the AQMD regulations regarding dust control, and attached a copy to his deposition. He stated these regulations and general construction practices require contractors to prevent dirt from "entering the atmosphere and causing a host of problems." He opined, "The contractor and/or general contractor that is responsible for covering the dirt pile does not need to know or understand what might be contained in the dirt, whether it be simply dirt particles, chemicals, toxics or fungus of any sort. The dirt simply must be promptly covered to prevent release into the atmosphere."

Bomel and J/K submitted replies and objected to portions of Miranda's experts' declarations. J/K's attorney, Joe Bollert, submitted a declaration stating Miranda had an opportunity to test the soil in the Spring of 2006 in connection with his workers' compensation case. He stated Miranda's counsel took several soil samples from Dumbo Downs on March 14, 2008.

Miranda filed a surreply and made evidentiary objections to Bollert's declaration. He submitted a supplemental declaration from Kirkland, who stated, "According to Mr. Bollert's declarations, soil samples were taken from four different areas on the [CSUF] campus. Even assuming these soil samples from CSUF tested negative for the *Cocci* fungus, such test results do not mean that the *Cocci* fungus is not in the soil. Direct soil sample testing for

the *Cocci* fungus, even in areas where the *Cocci* fungus is endemic, can test negative because, among other reasons, (1) the *Cocci* fungus grows sporadically in the soil and it is not evenly distributed, (2) soil samples represent a small cross-section of the particular area of land that is being tested for the *Cocci* fungus (soil samples only represent a few grams of soil), and (3) the *Cocci* fungus is extremely difficult to culture from a soil sample in a laboratory. As a result, besides direct sampling of soils or positive skin tests for Valley Fever, the presence of the *Cocci* fungus in a specific area can be determined by the recognition of the infection in humans. ('2000 USGS Operational Guidelines for Geological Fieldwork in Areas Endemic for Coccidioidomycosis (Valley Fever)' p. 7, attached as Exhibit Y to Kollmeyer Decl.)"

In February 2009, the court heard oral argument on the motions and took the matter under submission. In its minute order, the court granted the motions, concluding Miranda "failed to demonstrate a duty that was breached . . . or a triable issue of fact with respect to causation . . . ." The court determined asbestos cases were distinguishable because here there was "no acknowledged exposure to *Cocci* fungus under the control of . . . Bomel [and J/K]." The court noted Miranda was not alleging he suffered respiratory problems due to exposure to large amounts of dust, and he could not demonstrate *Cocci* fungus was ever in the dust he inhaled from Dumbo Downs. It determined Miranda failed to demonstrate the AQMD rules designed to minimize the impact of dust in the atmosphere were also "intended to prevent unforeseeable *Cocci* exposure."

The court concluded the case was more similar to those involving spider bites: "Holding [d]efendants liable for [Miranda's] injuries here would be like holding a gardener liable for allergies caused by pollen, or like holding a hotel liable for a spider bite where the hotel had no reason to know that a particular spider was present. The [c]ourt equates this fungus exposure to spider bites, tick bites, or illness from disease-carrying rodents—or illness as a result of natural disasters such as dust storms, earthquakes, or wildfires (in other words, there is no liability for illness from naturally occurring phenomena absent advance notice—which in this case would be advance notice that a particular fungus was present in the soil being moved). (*Butcher v. Gay* (1994) 29 Cal.App.4th 388, 404 [34 Cal.Rptr.2d 771] and *Brunelle v. Signore* (1989) 215 Cal.App.3d 122, 129 [263 Cal.Rptr. 415].)" The court sustained Bomel's and J/K's objections to Miranda's experts' declarations and specifically the opinions the dust from Dumbo Downs was a substantial factor in causing Miranda's Valley Fever disease. It overruled Miranda's objections to paragraphs seven and nine of Kollmeyer's declaration.

II

## A. *Standard of Review*

Miranda appeals from the trial court's grant of summary judgment and we, therefore, must "independently examine the record in order to determine whether triable issues of fact exist to reinstate the action." (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517] (*Wiener*); see also *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) "In performing our de novo review, we view the evidence in the light most favorable to plaintiff[] . . ." and we "liberally construe" plaintiff's evidence and "strictly scrutinize" that of defendants "in order to resolve any evidentiary doubts or ambiguities in plaintiff's favor. [Citation.]" (*Wiener, supra*, 32 Cal.4th at p. 1142.)

"A different analysis is required for our review of the trial court's . . . rulings on evidentiary objections. Although it is often said that an appellate court reviews a summary judgment motion 'de novo,' the weight of authority holds that an appellate court reviews a court's final rulings on evidentiary objections by applying an abuse of discretion standard. [Citations.]" (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694 [23 Cal.Rptr.3d 915].)

## B. *Negligence and Causation*

"In order to establish entitlement to summary adjudication of a cause of action, the moving party defendant must establish that the cause of action is without merit by negating an essential element or by establishing a complete defense. (Code Civ. Proc., § 437c [hereafter § 437c], subd. (f); *City of Emeryville v. Superior Court* (1991) 2 Cal.App.4th 21 [2 Cal.Rptr.2d 826].)" (*Westlye v. Look Sports, Inc.* (1993) 17 Cal.App.4th 1715, 1726–1727 [22 Cal.Rptr.2d 781].)

█ " 'The elements of a cause of action for negligence are well established. They are: "(a) a legal duty to use due care; (b) a breach of such legal duty; [and] (c) the breach as the proximate or legal cause of the resulting injury." ' [Citation.]" (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917–918 [50 Cal.Rptr.2d 309, 911 P.2d 496], italics omitted.) Here, the court granted summary judgment based on Bomel's and J/K's ability to defeat two

of these elements: (1) duty, and (2) causation. Summary judgment is proper if the ruling was correct on either ground. We choose to focus on the causation element.[1]

■ Ordinarily, a plaintiff may establish proximate cause without the testimony of an expert by providing evidence that indicates the defendant's conduct was a substantial factor in producing plaintiff's damages. (*Padilla v. Rodas* (2008) 160 Cal.App.4th 742, 752 [73 Cal.Rptr.3d 114] ["[t]o establish the element of actual causation, it must be shown that the defendant's act or omission was a substantial factor in bringing about the injury"].) However, "The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case. [Citations.] That there is a distinction between a reasonable medical 'probability' and a medical 'possibility' needs little discussion. There can be many possible 'causes,' indeed, an infinite number of circumstances which can produce an injury or disease. A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. This is the outer limit of inference upon which an issue may be submitted to the jury. [Citation.]" (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402–403 [209 Cal.Rptr. 456].)

Bomel and J/K met their burden of proving only that it was a *possibility*, not a reasonable medical probability, Miranda contracted Valley Fever by inhaling an airborne *Cocci* spore that originated from the soil at Dumbo Downs. Their expert, Kollmeyer, explained the fungus was endemic to a large portion of California, and scientific studies have shown the airborne fungal spores can travel in the wind. He stated spores can become airborne after any kind of disturbance of the soil by humans or natural causes. Given that over one-third of the population in the San Joaquin Valley tests positive for exposure to the fungus, and due to the great number of reasons for soil disturbance, "the exact source (home, recreation, work, travel, etc) of the exposure cannot be determined absent scientific data, e.g., soils tests, confirming the existence of the *Cocci* fungus in the soil at issue at the time of exposure." It was undisputed Miranda had no such scientific data.

■ Bomel and J/K argued that absent scientific data proving the soil at Dumbo Downs was the source of the fungal spores inhaled by Miranda, summary judgment was appropriate. They established there was no reasonable medical probability the dusty air Miranda inhaled from Dumbo Downs, as opposed to the air at home or some other location in California, contained

---

[1] Because we conclude summary judgment was properly granted on the causation issue, we do not render any opinion as to whether there was a duty or breach.

the spores that caused him to contract Valley Fever. This showing was sufficient to shift the burden to Miranda to create a triable issue of fact on the issue of causation.

Miranda submitted four expert declarations: two physicians discussed the issue of causation, and two construction experts focused on the issue of duty. Both medical experts agreed with Kollmeyer about how humans become infected with Valley Fever. They confirmed the fungus was endemic to a large area of California. Kirkland opined, "Exposure to dust from soil is a critical factor in determining the risk for infection . . . ." He concluded that because the fungus is endemic to Southern California, the absence of testing for the "fungus at any given location does not preclude a physician from rendering an opinion, to a reasonable degree of medical probability, that exposure from a certain source of dust from soil was a substantial factor in causing a person's Valley Fever." He concluded Miranda's exposure to dust "from the stockpile of dirt . . . was a substantial factor in causing [his] Valley Fever."

Similarly, Brautbar opined exposure to dust from soil was the "critical factor in determining the risk for infection of Valley Fever." He noted the incubation period from the time of exposure to the appearance of symptoms ranged from one to four weeks. Brautbar concluded Miranda's exposure to dust from the large pile of dirt stockpiled at Dumbo Downs "was a substantial factor in causing [his] Valley Fever" to a "reasonable degree of medical probability."

The trial court rejected these expert causation opinions as speculative. While medical and scientific data certainly supported their claim exposure to dust was a critical factor, neither expert accounted for the undisputed facts showing there were other reasonable and likely sources of the fungus spore causing Miranda's injury. Neither expert offered an opinion on whether there was a way to medically or scientifically determine the origins of the infecting fungal spore. Nor did they dispute the fungus grows all over California, the spores become airborne, spores are not visible to the naked eye, spores sometimes can be in dust-free air, spores are not immediately detectible, infection does not always generate symptoms, others working or living near Dumbo Downs were not infected with Valley Fever, and Miranda did not spend all his time near Dumbo Downs. In light of the above undisputed evidence, the fact Miranda was infected, standing by itself, does not create a reasonable inference the dust from Dumbo Downs, as opposed to another location, was the source of the disease.

Miranda characterizes his case as being like an asbestos exposure case where proof of causation by direct evidence is frequently impossible and therefore circumstantial evidence may be used. (See *Rutherford v.*

*Owens-Illinois, Inc.* (1997) 16 Cal.4th 953 [67 Cal.Rptr.2d 16, 941 P.2d 1203] (*Rutherford*).) The *Rutherford* case sets forth the controlling two-part test for determining whether exposure to asbestos from a particular product was a legal cause of a plaintiff's injury in an asbestos-induced personal injury case. "[T]he plaintiff must first establish some threshold exposure to the defendant's defective asbestos-containing products, and must further establish in reasonable medical probability that a particular exposure or series of exposures was a 'legal cause' of his injury, i.e., a substantial factor in bringing about the injury." (*Id.* at p. 982, fn. omitted, italics omitted.) "[P]laintiffs may prove causation in asbestos-related cancer cases by demonstrating that the plaintiff's exposure to defendant's asbestos-containing product in reasonable medical probability was a substantial factor in contributing to the aggregate dose of asbestos the plaintiff or decedent inhaled or ingested, and hence to the risk of developing asbestos-related cancer, without the need to demonstrate that fibers from the defendant's particular product were the ones, or among the ones, that actually produced the malignant growth." (*Id.* at pp. 976–977, fn. omitted, italics omitted.) In other words, "a particular asbestos-containing product is deemed to be a substantial factor in bringing about the injury if its contribution to the plaintiff or decedent's risk or probability of developing cancer was substantial." (*Id.* at p. 977, italics omitted.)

Factors to be considered in determining whether "inhalation of fibers from the particular product should be deemed a 'substantial factor' in causing the cancer" include "the length, frequency, proximity and intensity of exposure, the peculiar properties of the individual product, any other potential causes to which the disease could be attributed (e.g., other asbestos products, cigarette smoking), and perhaps other factors affecting the assessment of comparative risk . . . ." (*Rutherford, supra,* 16 Cal.4th at p. 975.) The reason so many factors are relevant in assessing the medical probability that an exposure contributed to plaintiff's asbestos disease is because often the disease is cumulative in nature, with many separate exposures contributing to the injury. As a result, multiple asbestos containing products can be considered a substantial factor in causing the plaintiff's injury. (*Ibid.*)

Miranda argues that like the plaintiff in *Rutherford*, he could not be expected to trace with "medical exactitude the unknowable path of the *Cocci* fungus to which he was exposed. Instead, [he] met his burden by proving by reasonable medical probability that his exposure to the approximate 1,100 to 1,600 cubic yards of excavated dirt from an endemic area for the *Cocci* fungus was a '*substantial factor contributing to the plaintiff's . . . risk of developing* [*Valley Fever*].' " We disagree. This case is not analogous to the asbestos exposure cases.

As noted above, in asbestos exposure cases, "[T]he plaintiff must first establish some threshold *exposure* to the defendant's *defective asbestos-containing* products . . . ." (*Rutherford, supra,* 16 Cal.4th at p. 982, fn. omitted, second italics added.) Miranda certainly established he was exposed to dirt and dust for several months. But unlike plaintiffs in the exposure cases, he did not establish it was defective, harmful, fungus-containing, or disease-packed dust or air. In other words, he cannot make the threshold showing of exposure to a harmful product. Contrary to Miranda's contention, without that threshold showing we do not get to the next step of determining if the "product" was a substantial factor.

We note Miranda's experts' declarations skip this threshold step and both render the opinion exposure to Southern California dust is a "significant factor" in catching Valley Fever, and therefore, inhaling dust from Dumbo Downs was a "significant factor" in Miranda's illness. However, the question is not whether inhaling Southern California dust increases your general risk of catching the disease. Rather, in this case the issue is whether the uncovered dirt at Dumbo Downs was *the source of the fungus spore causing Miranda's illness* creating liability. Miranda's experts failed to present any evidence on this point. Without evidence of a fungus-infected product, on what basis can it be considered a substantial factor in Miranda's illness?

As aptly noted by the trial court, another distinction between this case and the asbestos exposure cases is the defendants in those cases acknowledge the products under their control contained asbestos. Bomel and J/K claim they did not know, and had no way of knowing, whether *Cocci* fungus was in their dirt stockpile. Indeed, Miranda cannot prove it was there. The legal test applied in asbestos exposure case is inapt.

As this court recently stated with respect to a food poisoning case, "the logical fallacy of 'post hoc, ergo propter hoc' (after the fact, therefore because of the fact)" does not carry the day. (*Sarti v. Salt Creek Ltd.* (2008) 167 Cal.App.4th 1187, 1196 [85 Cal.Rptr.3d 506] (*Sarti*).) "Just because you get sick soon after eating at a restaurant doesn't prove bad food or some other contamination at the restaurant caused it. Any other rule would be untenable, since it would make restaurants de facto health insurers of their customers." (*Ibid.*) There was no evidence Miranda got sick immediately after inhaling a fungal spore. His own expert attested the incubation period can be several weeks. Because Miranda developed the illness possibly weeks after inhaling the spore, one can only guess as to its source because the fungus grows sporadically throughout California.

The trial court correctly concluded Valley Fever is more akin to naturally occurring diseases such as Lyme disease (*Butcher v. Gay, supra,* 29

Cal.App.4th at p. 404 [summary judgment granted in action against home-owner who permitted his dog carrying a Lyme-disease-carrying tick to sit on plaintiff's lap]), or spider bites (*Brunelle v. Signore, supra*, 215 Cal.App.3d 122 [summary judgment granted in favor of vacation homeowner who was sued by guest suffering serious injuries after he was bitten by a brown recluse spider]). Based on the experts' description of the disease, Valley Fever spreads much like other naturally occurring illnesses. One can have suspicions, but without scientific data tracing the source, one cannot be sure who infected him or her with a head cold or stomach flu. We do not wish to downplay the seriousness of Valley Fever, but its source is just as elusive as the sources of most other invisible bacteria or virus.

We recognize Miranda contends his case is like the line of bacteria food poisoning cases which he asserts applies a special "reasonable inference test." (Citing *Sarti, supra*, 167 Cal.App.4th 1187.) Not so. As discussed in great detail in *Sarti*, food poisoning defendants "are somehow accorded a special, protected status with an abnormally 'heightened' standard of causation . . . . Despite intimations in [*Minder v. Cielito Lindo Restaurant* (1977) 67 Cal.App.3d 1003 [136 Cal.Rptr. 915]] . . . , food poisoning cases are governed by the same basic rules of causation that govern other tort cases. Reasonable inferences drawn from substantial evidence are indeed available to show causation." (*Sarti, supra*, 167 Cal.App.4th at p. 1190.)

In the *Sarti* case, the plaintiff and a friend ate an appetizer containing raw ahi tuna at a restaurant. (*Sarti, supra*, 167 Cal.App.4th at p. 1191.) The next day, the plaintiff became ill and after several days had to be hospitalized in intensive care. The doctor determined the plaintiff ingested campylobacter bacteria, a pathogen not found in raw tuna, unless it has been cross-contaminated by raw chicken, where bacteria are common. (*Ibid.*) The Orange County Health Department issued a " 'food borne illness' report dated . . . a little less than a month after the meal. The report identified four practices at [the restaurant] that could lead to cross-contamination. Specifically: Wipe-down rags were not being sanitized between wiping down surfaces. There was also an insufficient amount of sanitizer in the dishwasher. Chicken tongs were sometimes used for other food . . . . Raw vegetables were stored under 'raw meat' (the expert testifying did not say what kind of raw meat), so that a drop of raw meat juice might get on the vegetables. There was also testimony that the waiter who served Sarti had used a wet, unsanitized rag stored underneath the bar to wipe down Sarti's table." (*Ibid.*)

Based on this evidence, the jury in *Sarti* rejected all the evidence showing the restaurant had taken careful measures to keep its raw chicken separate from the tuna. It concluded the restaurant was liable, and awarded the plaintiff substantial damages for her injuries. The trial court granted the

restaurant's motion for judgment notwithstanding the verdict, based on its misunderstanding that food poisoning cases required more than an reasonable inference based on collateral evidence to prove causation. (*Sarti, supra*, 167 Cal.App.4th at p. 1192.) A different panel of this appellate court reversed the judgment, concluding food poisoning cases are governed by the same basic rules of causation as other tort cases. (*Ibid.*)

Specifically, the *Sarti* court determined, "In the case before us, unlike *Minder*, there was expert testimony expressly making the link between the particular kind of food poisoning involved (campylobacter) and the particular unsanitary conditions found at the restaurant—cross-contamination from raw chicken. An expert for Sarti, Dr. Andrew Kassinove, testified that anything that might have touched something that touched raw chicken would be cross-contaminated. Particularly given the lack of proper sterilization in the dishwasher and the waiter's constant use of an unsterilized wipe-down rag, a reasonable jury could infer either that a rag used to wipe down a raw chicken board was used to wipe down a vegetable or tuna board, or, alternatively, that a drop or two of raw chicken juice may have leaked onto some of the vegetables stored beneath it." (*Sarti, supra*, 167 Cal.App.4th at p. 1207.)

The court rejected the restaurant's assertion "Sarti was required, as a matter of law, to exclude all 'possibilities' other than the meal she had at the restaurant. As we have already shown . . . that point is untenable. . . . California law on causation is 'substantial factor.' And, . . . a plaintiff need not ' "exclude every other conclusion" ' than the defendant's negligence. [Citation.]" (*Sarti, supra*, 167 Cal.App.4th at p. 1210.) The court concluded, "Given the facts of the case before us, we are spared the tough problem of whether the existence of an alternative 'explanation' supported by substantial evidence competing with the finding the jury actually chose might somehow defeat, as a matter of law, the jury's finding of food poisoning from the restaurant meal. . . . [The restaurant] has cited no substantial evidence *requiring a finding* that Sarti picked up the campylobacter from handling a leaky package of chicken while working at a checkstand, or handling a cat, or somehow being exposed to a baby in the house, or eating in the lunchroom with the employees from the meat department." (*Id.* at p. 1211.) The court recognized its review of a jury verdict was limited, and because the evidence created a reasonable inference of a causal link the judgment had to be affirmed. (*Ibid.*)

Miranda argues that like the *Sarti* plaintiff who did not have to provide direct evidence linking her food poisoning with some specific food, he should not be required to provide direct evidence linking his illness with a specific

source of fungus. The analogy, however, cannot be made because the *Sarti* plaintiff submitted strong circumstantial evidence she ate food at a specific restaurant with documented unsanitary conditions that permitted cross-contamination of other foods with raw chicken, a specific food known to contain the bacteria causing her food poisoning. From this substantial evidence the jury could make the reasonable inference there was a causal link between a specific restaurant's unsanitary conditions and her food poisoning. In contrast, Miranda submitted evidence the soil, and sometimes the air, in Southern California is known to contain the pathogen causing his disease. This is evidence from which the jury could link dust inhalation in Southern California and his Valley Fever. However, there was no circumstantial evidence from which the jury could reasonably infer Dumbo Downs, as opposed to any other specific dirt pile, was the source of the *Cocci* fungal spore that infected Miranda. Dumbo Downs was only one of many reasonably possible sources of dust that may have contained the pathogen. This case is governed by the same basic rules of causation as other tort cases, and we agree Miranda failed to create a triable issue of material fact.

## C. *Evidentiary Objections*

Because there are other explanations for the cause of Miranda's injury, and it could have occurred even in the absence of negligence, proof of causation requires more than speculation, conjecture, and inferences as to whom to blame. We conclude the trial court properly sustained the evidentiary objections to Miranda's experts' speculative conclusions about causation.

██ Expert testimony is admissible only if based on matter of a type that may reasonably be relied on by an expert in forming an opinion on the subject to which his testimony relates. (Evid. Code, § 801, subd. (b).) Miranda's experts properly formed opinions on how Miranda caught Valley Fever, i.e., he inhaled a fungal spore. They certainly had expertise about the nature of the disease and the characteristics of the *Cocci* fungus. They did not refute Kollmeyer's opinion the source of the infecting spore is difficult to determine because it cannot be seen, it is airborne, it can travel in the wind, and it is endemic to a large area of California. Indeed, one of Miranda's experts agreed the source often cannot be determined by testing the soil, due to the sporadic growth patterns of the fungus.

None of Miranda's experts offered research studies, experience, or really any specific factual basis upon which to render an opinion about whether the dirt and dust from Dumbo Downs contained the infecting fungal spore. Their statements confirming the fungal spores can be found anywhere in California hurts rather than helps Miranda's case. They offer no reason why the infecting fungal spore could not have been unearthed from other CSUF

construction projects, the Fullerton Arboretum, the local city parks, or Miranda's neighbor's yard. There was no evidence other employees or residents near Dumbo Downs were infected. Their speculative opinion the source was Dumbo Downs lacked foundation and it cannot be said the court abused its discretion in sustaining the objections.

Miranda asserts the court improperly overruled his objection to portions of Kollmeyer's declaration. Specifically, he objected to Kollmeyer's statements regarding the airborne nature of the fungal spores and given the ability to travel in the wind it is difficult to prove the source of infection absent some kind of scientific data. Kollmeyer referred to several science-based articles in making these statements, primarily articles published by federal agencies and written by medical experts. Miranda did not challenge the sufficiency of the USGS report, or object to its inclusion, or challenge the facts as unreliable. Rather, he argues Kollmeyer's declaration was "mere regurgitation of the scientific journal" making his opinion "inadmissible hearsay." However, he cites to no legal authority to support his claim experts cannot refer to scientific facts contained in scientific articles or reports. Miranda's experts regurgitated many of the same facts about the *Cocci* fungus in their declarations. Those experts did not disapprove of the USGS report or its findings. Indeed, Kirkland in the surreply referred directly to the same USGS report as Kollmeyer, directing the court to look at the report attached to Kollmeyer's declaration.

Kollmeyer was a well-qualified and highly educated scientist experienced with the issues of environmental infectious diseases and possible means of exposure. The record shows Kollmeyer earned a master of public health, environmental health sciences—industrial hygiene program, at University of California, Berkeley. He obtained a bachelor of science, political economy of natural resources from the same school. In addition to participating in symposiums and conferences, Kollmeyer works as a certified industrial hygienist, and he has published several articles in his field of expertise. It is his job to anticipate, recognize, evaluate, and control health safety hazards faced by people at work or in their communities. (See <http://www.abih.org/general/cihcaih.html> [as of July 30, 2010] [American Board of Industrial Hygiene Web site].) "Health and safety hazards cover a wide range of chemical, physical, biological and ergonomic stressors." (*Ibid.*) Miranda offers no reason why Kollmeyer was not qualified to formulate an expert opinion based on other scientific studies of the *Cocci* fungus. This potentially dangerous fungus certainly qualifies as a biological health and safety hazard faced by people at work and in their community throughout Southern California.

## III

The judgment is affirmed. Respondents shall recover their costs on appeal.

Bedsworth, Acting P. J., and Moore, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 27, 2010, S186056. Corrigan, J., did not participate therein.