Filed 9/25/14  Lyznick v. County of Los Angeles CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ROBERT LYZNICK et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>COUNTY OF LOS ANGELES,<br><br>Defendant and Respondent. | B247961<br><br>(Los Angeles County<br>Super. Ct. No. BC473157) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Yvette M. Palazuelos, Judge.  Affirmed.

Law Offices of Gregory W. Smith, Gregory W. Smith, Boris Koron; Benedon & Serlin, Douglas G. Benedon, Wendy S. Albers for Plaintiffs and Appellants.

Laquer Urban Clifford & Hodge, Robert Scot Clifford, J. Paul Moorhead for Defendant and Respondent.

_____

The trial court granted summary judgment in favor of the County of Los Angeles (County) in a lawsuit by two County employees alleging a violation of the Fair Employment and Housing Act (FEHA). Under FEHA, an employer cannot retaliate against employees who have filed a complaint, testified, or assisted in any proceeding challenging unlawful employment practices. (Gov. Code, § 12940, subd. (h).) We affirm. The employees did not show that they were subjected any adverse action that materially affected the terms, conditions or privileges of their employment.

## FACTS

Appellants Robert and Craig Lyznick are brothers employed as deputy sheriffs by respondent County. Robert began working for the Sheriff's Department in 1988, and Craig followed him there in 1990. They have been assigned to the Metrolink station in Chatsworth since 2007.

In 2008, Robert complained that he was being sexually harassed by a supervisor, Charles Dery. Craig testified in Robert's sexual harassment suit. Dery responded with a lawsuit for defamation against the Lyznicks. In 2010, Robert prevailed against the County in an FEHA action for sexual harassment, and both brothers prevailed against Dery in the defamation suit.

Despite the litigation, appellants remain in the County's employ at the Chatsworth Metrolink station, and have not been suspended or disciplined. Dery, on the other hand, left the sheriff's department in 2009, after an internal affairs investigation determined that he engaged in sexual harassment and workplace violence. Dery resigned when investigators recommended that his employment be terminated.

Robert maintains that he has been negatively affected since he lodged his sexual harassment complaint in 2008. He testified that his job evaluations were reduced; however, he also stated that his evaluation for 2011 was "outstanding," the highest possible employee rating. Since 2004, Robert's evaluations have been "very good" (2004-2005, 2008-2010) or "outstanding" (2005-2007, 2010-2011).

In 2010, Robert sustained a back injury on the job. After a two-month convalescence, he returned to work on light duty, meaning that he had controlled tasks

and limited contact with the public to avoid re-aggravating the injury. He was sent to Gateway Plaza at Union Station, which has light-duty jobs for deputies. This required a long drive to work, in violation of his doctor's medical restrictions, and prolonged his recovery. He filed a grievance in late April 2011. A few weeks later, his physician released him from light duty. Robert returned to the Chatsworth station and the grievance was dropped.

Robert believed that his temporary postings amounted to "freeway therapy" in retaliation for his sexual harassment suit. Freeway therapy is a punishment in which deputies are given extended driving assignments. Robert's supervisor agreed that this could have been retaliation, reasoning that Robert could have worked as a technician in Chatsworth, doing paperwork, instead of being sent to downtown Los Angeles. However, a lieutenant at the Chatsworth station declared that the technician job in Chatsworth is a part-time job for civilians, not deputies. Robert had to be sent to a larger station that could use a full-time deputy in an appropriate capacity. A sergeant in Robert's station declared that while she was on light duty for 13 months since 2008, she was assigned to a desk job at the Rail Operations Center in Compton because the Chatsworth station does not have suitable light-duty jobs for deputies.

Robert applied for promotion to a sergeant position. The Sheriff's Department offers an exam for deputies wishing to apply for a sergeant position, which consists of three sections: (1) a written test with multiple choice, true or false and other objective questions (35 percent of the total score); (2) a structured interview in which the candidate is given real-life scenarios and the evaluators look for predetermined, specified responses to the defined scenarios (35 percent of the total score); and (3) an appraisal of promotability, a rating from the candidate's supervisors indicating readiness for a management position (30 percent of the total score). A score above 90 is considered exceptional; 80 to 90 is above average; and scores below 80 are average to below average. Candidates are placed in four "bands." Only high-scoring candidates in Bands 1 and 2 are promoted to the position of sergeant.

It is undisputed that in 2006 (years before he filed a harassment claim), Robert took the sergeant's exam, receiving a composite score of 80.087, consisting of 76.207 on the written test; 74.500 on the structured interview; and 89 on the appraisal of promotability. This placed him in Band 4, the bottom tier, so he was not promoted to sergeant. In 2009, during his first FEHA lawsuit, Robert took the sergeant's exam and received a composite score of 77.691, consisting of 75.760 on the written test; 66.500 on the structured interview; and 93 on the appraisal of promotability. This placed him in Band 4, so he was not promoted to sergeant.

Although his supervisors gave him a promotability rating of 93 on the sergeant's exam in 2009, Robert contends that the exam may not have been fairly scored because one of his supervisors, Captain Patrick Jordan, made it clear that Robert would never be promoted, no matter how well he did on the exam.

Craig makes a similar claim that his supervisors told him he would not be promoted, no matter how well he did on the exam. Craig heard, third hand, that Captain Jordan ordered supervisors to retaliate against him. (Jordan allegedly gave the order to Nina Sutter, who told Charles Moyland, who told Craig.) Since 2004, Craig's job evaluations have been "very good" (2004-2008, 2010-2011) or "competent" (2008-2010).

Craig took the sergeant's exam in 2006 and received a composite score of 83.571, consisting of 72.069 on the written test, 89 on the structured interview, and 88 on the appraisal of promotability. His composite score placed him in Band 3, so he was not promoted to sergeant. Craig took the exam in 2009 and received a composite score of 78.227, consisting of 78.790 on the written test, 65 on the structured interview and 93 on the appraisal of promotability. His composite score placed him in Band 4, so he was not promoted to sergeant. Craig took the exam in 2011 and received a composite score of 81.8, consisting of 75 on the written test, 79 on the structured interview, and 93 on the appraisal of promotability. His composite score placed him in Band 4 and he was not promoted to sergeant.

The brothers claim that their performance evaluations were deliberately lowered. Robert testified that he saw on a computer that he originally received an "outstanding"

evaluation for 2009, but it was later reduced to "very good." Likewise, Craig's evaluation was reduced from "very good" to "competent" in 2009. The evaluations they saw were unsigned; the signed evaluations were lower.

Captain Jordan has known Craig for 10 years. He described Craig as petty, vindictive, mean, and as someone who undermined superiors and targeted peers: he is unsuited to be a manager. Sergeant Robert Kenessey testified that Captain Jordan directed him to lower Craig's evaluation, so he did. Kenessey believed that Craig did not deserve a "competent" rating.

The performance evaluations are important because they are used to determine a deputy's "appraisal of promotability" in the sergeant's exam. However, according to the County's sworn examinations expert, even if Robert and Craig had received perfect scores of 100 on the appraisal of promotability in 2009 and 2011, their composite scores would still not have taken them out of Band 3 or 4.

Craig testified that the County retaliated against him for participating in Robert's sexual harassment claim. As evidence, he cited the defamation suit against him and Robert; however, the plaintiff in the defamation suit was Charles Dery, not the County. Craig testified that in an unknown year an unknown individual placed rodent droppings in his cruiser; he made a joke about it to other deputies, then had it vacuumed up. He thinks someone was trying to tell him that he was a "rat" for testifying in Robert's case. Also, some unknown person spit on Craig's cruiser while it was parked at the sheriff's station. He did not report this incident. Someone left a chewed piece of gum on Craig's locker at work and a book called "Innocent Man" was placed in his mailbox.

A deputy named Rickell, who supported Charles Dery, looked at Craig in a threatening manner while loading a gun, altered a gun rack, and accused Craig of falsifying a report. Craig complained about Rickell's conduct: an internal investigation deemed Craig's claim unfounded. Captain Jordan told Rickell that "You can't engage in this behavior" because it was childish.

Since 2008, neither Robert nor Craig has applied for departmental "bonus positions," which include detective and field training officer positions. They claim that

they have been prevented from signing up for overtime because the overtime sign-ups take place when they are not at work, or Rickell signed up with them and they did not want to work with him. Robert overheard a supervisor tell someone that he would never be promoted. Craig feels ostracized because "Nobody wants to work with me" and he was unable to transfer. Robert declared that he felt continuously ostracized by his supervisors and colleagues. When the Lyznicks received an award for capturing a murder suspect, Captain Jordan referred to them as "dead wood" in front of others.

## PROCEDURAL HISTORY

Appellants filed administrative claims against the County. Robert claimed that he was subjected to retaliation for suing the County for sexual harassment and his ability to be promoted was destroyed. Craig claimed that he was subjected to retaliation for testifying in his brother's sexual harassment case: he was denied advancement; was told he would never be promoted to sergeant; received poor evaluations; animal excrement was placed in his vehicle; and his safety was compromised. Appellants received right-to-sue letters from the Department of Fair Employment and Housing on April 11, 2011.

Appellants filed this lawsuit alleging that the County retaliated against them for their participation in Robert's sexual harassment claim against the County, in violation of FEHA. They allege that the County deliberately ruined their careers by giving them poor performance evaluations, prevented them from being promoted within the Sheriff's Department, and caused them humiliation and diminished income. The County denied the allegations.

The County pursued a motion for summary judgment. It argued that appellants have not suffered adverse employment actions necessary to support a retaliation case. Their employment evaluations have not changed since 2005, nor have they been suspended or disciplined. Appellants responded by listing many examples of what they described as retaliatory conduct. Though many of the incidents preceded their administrative claim by several years, appellants maintained this was part of a course of continuing conduct starting in 2008.

6

The trial court granted judgment in favor of the County. It found no admissible evidence that appellants were denied job opportunities or benefits, or that the County was responsible for Charles Dery's defamation action against appellants. Appellants made no showing that their job evaluations—even if changed by supervisors—were used to detrimentally alter the terms or conditions of their employment. Further, even if appellants had received perfect appraisals from their supervisors, their scores on the objective portions of the sergeant's exam were too low to permit promotion. Robert's temporary transfer to a different station while on light duty was not an adverse employment action because his pay and benefits were unaffected, even if he disliked the transfer, because the evidence showed that the Chatsworth station lacked full-time, light-duty jobs for deputies. Appellants' other claims of ostracism (rat droppings, denial of medals of valor, chewing gum on a locker, spit on a patrol car) described minor conduct by fellow employees that was reasonably likely to do no more than anger appellants. Appellants timely appeal from the judgment.

## DISCUSSION

### 1. Standard of Review

Summary judgment is warranted if there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)[1] A judgment entered in favor of the defendant is appealable. (*Id.*, subd. (m)(1).) Review is de novo. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767; *Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.) We strictly scrutinize the moving party's papers, construing the facts and resolving all doubts and ambiguities in the evidence in favor of appellants. (*Innovative Business Partnerships, Inc. v. Inland Counties Regional Center, Inc.* (2011) 194 Cal.App.4th 623, 628; *Sellery v. Cressey* (1996) 48 Cal.App.4th 538, 543.) Evidentiary rulings on summary judgment are reviewed for an abuse of discretion. (*DiCola v. White Brothers Performance Products,*

---

[1] Unlabeled statutory references in this opinion are to the Code of Civil Procedure.

7

*Inc.* (2008) 158 Cal.App.4th 666, 679; *Miranda v. Bomel Construction Co., Inc.* (2010) 187 Cal.App.4th 1326, 1335.)

## 2. <u>Exclusion of Deposition Testimony</u>

The trial court excluded the Lyznicks' deposition testimony, which they offered as evidence of discrimination. Relying on section 2025.620, the court reasoned that plaintiffs could not rely on their depositions in opposing summary judgment because "plaintiffs are not adverse to themselves and the transcripts are not being used for impeachment purposes. Plaintiffs are also not unavailable and do not live more than 150 miles away. Finally, this situation is not an 'exceptional circumstance' that would permit the use of the deposition transcript instead of a sworn affidavit."[2]

An opposition to summary judgment "shall consist of affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which judicial notice shall or may be taken." (§ 437c, subd. (b)(2).) It has long been accepted that "a deposition may be treated as an affidavit for the purposes of Code of Civil Procedure section 437c, and it is proper to use a deposition in support of, or in opposition to, a motion for summary judgment *in conjunction with or in lieu of affidavits*." (*Estate of Kerner* (1969) 275 Cal.App.2d 785, 789, italics added. Accord: *Kramer v. Barnes* (1963) 212 Cal.App.2d 440, 444 [on defendant's motion for summary judgment, plaintiff did not file any counteraffidavits, but prevailed on appeal based on his own deposition testimony]; *Blaustein v. Burton* (1970) 9 Cal.App.3d 161, 176; *Truslow v. Woodruff* (1967) 252 Cal.App.2d 158, 164.)

---

[2]    Section 2025.620 states, in pertinent part: "At the trial or any other hearing in the action, any part or all of deposition may be used against any party who was present or represented at the taking of the deposition . . . so far as admissible under the rules of evidence . . . in accordance with the following provisions: (a) Any party may use a deposition for the purpose of contradicting or impeaching the testimony of the deponent as a witness, or for any other purpose permitted by the Evidence Code. (b) An adverse party may use for any purpose, a deposition of a party to the action . . . . (c) Any party may use for any purpose the deposition of any person [if] (1) The deponent resides more than 150 miles from the place of the trial or other hearing. . . ."

8

In a Supreme Court case, the defendants sought summary judgment, which they supported with affidavits, and plaintiff submitted his deposition, "which is treated as an affidavit in opposition to the motion." (*Desny v. Wilder* (1956) 46 Cal.2d 715, 725.) "[A] deposition has all of the significant attributes of an affidavit and more. Not only is it a statement . . . taken under oath, but it also affords the privilege of cross-examination to the opposing party, thus giving it added reliability." (*Nizuk v. Gorges* (1960) 180 Cal.App.2d 699, 709.)

Section 2025.620 expresses regard for "the importance of presenting the testimony of witnesses orally in open court." (§ 2025.620, subd. (c)(3).) However, live testimony is normally not permitted at law and motion hearings. (Cal. Rules of Court, rule 3.1306(a).) Court calendars would be derailed if each motion for summary judgment resulted in a trial with live witnesses. It makes little sense to allow a self-serving sworn declaration from a party opposing summary judgment, while disallowing equally self-serving deposition testimony from the same person, which is also under oath and has the benefit of being subject to cross-examination.

The County treats section 2025.620 as a revelation that altered existing law on the use of depositions in summary judgment hearings. It is not new law. Former section 2016, enacted 57 years ago, is nearly identical to section 2025.620, and it pre-dates the Court of Appeal cases cited above regarding the use of depositions as affidavits on a motion for summary judgment. (Stats. 1957, ch. 1904, p. 3323.)[3] The law is essentially the same; only the section number has changed.

---

[3]  Former section 2016, subdivision (d) begins, "At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented . . . in accordance with any one of the following provisions: (1) Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness. (2) The deposition of a party . . . may be used by an adverse party for any purpose. . . ."

The County cites a case involving the use of interrogatories to defend against summary judgment, *Great American Ins. Cos. v. Gordon Trucking, Inc.* (2008) 165 Cal.App.4th 445, 450. The superficial, three-sentence-long discussion in *Great American* regarding interrogatories does not impact the decades-long appellate holdings regarding the use of depositions. There is no case law disapproving the use of depositions in lieu of affidavits in summary judgment motions or oppositions.

Section 2025.620, subdivision (e) allows a party to "offer in evidence all or any part of a deposition, and if the party introduces only part of the deposition, any other party may introduce any other parts that are relevant to the parts introduced." The County relied upon large portions of appellants' depositions in support of its motion. Once the County introduced appellants' depositions, appellants could reasonably submit other, admissible portions of the depositions to counter the motion. It was legal error to sustain a blanket objection to appellants' use of their sworn depositions in lieu of affidavits while opposing summary judgment.

Although appellants were entitled to use their depositions in conjunction with their declarations to show alleged acts of retaliation, the trial court sustained specific objections to portions of the relied-upon testimony that are hearsay, lack foundation, are speculative, irrelevant, or amount to a legal opinion. Once the trial court exercised its discretion and ruled on specific objections, appellants have the burden on appeal of showing that the court abused its discretion. (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 852.) Appellants do not challenge the trial court's specific evidentiary rulings in their brief, forfeiting any claim of error.

**3. Elements of a FEHA Retaliation Claim**

A plaintiff making an FEHA retaliation claim "must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. [Citations.]" (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).)

10

A retaliation claim requires a substantial adverse change that materially affects employment. (*Yanowitz*, *supra*, 36 Cal.4th at p. 1036; *Holmes v. Petrovich Development Co., LLC* (2011) 191 Cal.App.4th 1047, 1063.) If a change "is merely contrary to an employee's interests or not to the employee's liking," it is not sufficient to show a substantial adverse effect on employment. (*Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1455.) The courts do not micromanage business practices. (*Ibid.*)

"Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach" of FEHA. (*Yanowitz*, *supra*, 36 Cal.4th at pp. 1054-1055.) A pattern of systematic retaliation may form the basis for a claim. (*Id.* at pp. 1055-1056.) But "a mere offensive utterance or even a pattern of social slights . . . cannot properly be viewed as materially affecting the terms, conditions or privileges of employment." (*Id.* at p. 1054.) The courts consider the allegations "collectively under a totality-of-the circumstances approach." (*Id.* at p. 1052, fn. 11.)

## 4. The Lyznicks' Retaliation Claims

The Lyznicks identify four areas in which they believe they were subjected to retaliation for the sexual harassment lawsuit. As we shall see, the alleged misconduct did not materially alter the terms, conditions or privileges of their employment.

### a. *Denial of Job Advancement*

Appellants contend that Captain Jordan ordered other supervisors to retaliate against them. In support of this contention, they cite deposition testimony. Robert testified that he overheard Jordan tell a sergeant that Robert is "never gonna promote." Jordan said something similar to Craig. It is speculation that the comment had anything to do with the sexual harassment suit: it could equally be an acknowledgement that Robert and Craig have historically scored poorly on the objective portions of the sergeant's exam, which prevents them from achieving the minimum promotional ranking.

11

Though inferences may be drawn from the evidence, an inference "'cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork.'" (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 389.)

Appellants cite Robert's testimony regarding the lowering of Craig's evaluation. When asked "Who do you think lowered that evaluation?" he replied, "At the direction of Pat Jordan, most likely." Again, this is speculation. The trial court did not abuse its discretion by rejecting unsigned performance evaluations that the Lyznicks submitted as proof that their evaluations were lowered. Appellants' belated attempts to declare that these are true and accurate "versions" of their evaluations fail.

An authentication must establish "that the writing was made or signed by its purported maker." (Cal. Law Revision Com. com., Deering's Ann. Code (2004 ed.) foll. Evid. Code, § 1400, p. 628.) There is no clue who made these unsigned documents, whether they were drafts for discussion, or whether they are complete fabrications. They are not official records. Without proper authentication, the unsigned documents cannot be received in evidence. (Evid. Code, § 1401, subd. (a).)

Even if Captain Jordan reduced Craig's evaluation, the County offered a legitimate business explanation. Specifically, Jordan worked with Craig for 10 years and found Craig unsuitable for management because he was mean, petty, vindictive, targeted his peers and undermined his superiors. This explanation was not negated. There is no link between Jordan's low opinion of Craig's temperament and Robert's lawsuit. More to the point, it had no adverse impact on the brothers' careers with the County.

"The employer and the public have a legitimate interest in efficient, cost-effective, and high-quality work. Employers need to be able to manage employees without fear that routine employment decisions, or attempts at improving employee performance, will lead to litigation" or judicial micromanagement of business practices. (*McRae v. Department of Corrections & Rehabilitation*, *supra*, 142 Cal.App.4th at p. 387.) The Lyznicks' evaluations did not describe them as "incompetent," "dishonest," or "insubordinate." (Compare *Akers v. County of San Diego*, *supra*, 95 Cal.App.4th at p. 1456.) No boxes are checked characterizing their work as "unsatisfactory."

12

Critically, neither Robert nor Craig performed well on the sergeant's examination. Even if they had each received 100 on the "appraisal of promotability," they could not be promoted because they scored too low on two objective tests that counted for 70 percent of their composite score. It is undisputed that Robert's appraisal of promotability *increased* from a score of 89 in 2006 (two years before the FEHA claim) to a score of 93 in 2009 (while his claim was pending). Likewise, Craig's appraisal of promotability *increased* from 88 (2006) to 93 (2009, 2011). No jury could find that appellants' rising promotability scores from their superiors showed a deliberate attempt to prevent them from becoming sergeants. The evidence only showed that appellants needed to study harder for the written exam, which does not raise a triable issue of retaliation.

Craig declares that he was denied a detective position "around the time I cooperated with the sexual harassment investigation." Craig also testified that he applied for a field training officer position, but does not know if it was before or after he cooperated with his brother's investigation; nevertheless, he claims that he applied and, in a conversation with someone he does not remember, his application was denied. The County's records indicate that neither of the Lyznicks applied for detective or field training officer positions since 2008.

There is no foundation for Craig's vague recollection of applying for positions "around the time" of the initial investigation, and no proof that if he did apply, the applications were denied due to retaliation, as opposed to lack of ability. Craig does not recall receiving an e-mail or formal document denying his application. He forgot who told him that "there's something going on in your career" that prevented him from becoming a detective. Without the name of a supervisor and without knowing what the person meant by "something going on," Craig's testimony is inadmissible as proof of retaliation. He opined that "it seemed like they [were] aware that I was going to be sued and they didn't want to get involved with me going back and forth to court in a lawsuit when I should be doing my functions as a detective." Craig's speculation about how things seemed does not establish an FEHA claim, nor do the hearsay opinions of a union representative that were expressed to Craig.

13

In sum, there is no basis for a claim that the Lyznicks were denied job advancement as a result of intentional retaliation. The County's business records show that the Lyznicks did not apply for detective or field training positions since the sexual harassment claim was made, and this was not refuted by admissible evidence. The sergeant positions that the Lyznicks did apply for, before and after the sexual harassment claim, were not awarded because they scored too low on the objective portions of the examination, far lower than on the subjective portion. There is no evidence that appellants were disciplined, nor was their pay reduced at any time.

### b. *Offensive Comments, Gestures and Disparate Treatment*

The Lyznicks maintain that they endured pervasive workplace harassment that amounted to an adverse employment action. In particular, they were demeaned by Captain Jordan in front of coworkers while accepting an award; Craig had rat excrement placed in his cruiser; chewed up gum was placed on his locker; a book was placed in his mailbox; his cruiser was spit upon; and his gun rack was altered. He was accused of falsifying a police report and vandalizing a police car. Craig never saw who was responsible for the mischief, leaving us with only speculation and conjecture. The trial court sustained objections that the testimony lacks foundation.

"'[W]orkplace harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action.'" (*Yanowitz*, *supra*, 36 Cal.4th at p. 1056, fn. 16.) Harassment is not pervasive if it "is occasional, isolated, sporadic, or trivial; rather, the employee must show a concerted pattern of harassment of a repeated, routine, or a generalized nature." (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 283.) It is not enough for a plaintiff to subjectively perceive the workplace as hostile if a reasonable person would not find it so. (*Id.* at p. 284.)

A handful of random boorish pranks over the course of several years does not amount to concerted, routine workplace harassment. Craig believed that Deputy Rickell was responsible for the pranks and felt threatened by him. He claims Captain Jordan "failed to take any action to prevent the abuse." However, it is unrefuted that when Jordan learned of Rickell's conduct, he called him in and told him to stop his childish

behavior. The County investigated Craig's complaints about Rickell. There is no evidence that Rickell's conduct continued after he was reprimanded. (See *Kelley v. The Conco Companies* (2011) 196 Cal.App.4th 191, 207 [no pervasive harassment when plaintiff complained about a coworker, who ceased his misconduct when confronted by management].)

Even if a reasonable person would find a wad of chewing gum, or spit or animal droppings obnoxious, and even if we assume that Deputy Rickell was responsible, there is no link between the pranks or the perceived threats and Craig's testimony in his brother's sexual harassment suit. At most, the evidence showed the Craig and Rickell disliked each other. Further, a stray remark by Captain Jordan about "dead wood" (made while he was awarding appellants for apprehending a murder suspect), unconnected to employment decisionmaking, cannot be given any weight where, as here, there is no evidence of a material adverse effect on appellants' employment. (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 231; *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 809.)

Appellants contend that the Sheriff's Department changed its sick leave policy to retaliate against them. There is no admissible evidence from a person with knowledge of County human resource policies that the Sheriff's Department changed its sick leave policy at all, let alone changed its policies as a way to punish Craig when he had emergency dental work or was shot in the hand during a training class.

It beggars the imagination to think that a policy change was effectuated to retaliate against two people, in a government agency that employs thousands. Craig does not claim that he was denied workers' compensation benefits, if he was injured during on-the-job training. The record does not bear out a monetary loss of any wage, salary, or benefit for either of the Lyznicks. If they did not work overtime, it was because they chose not to work at the same time as Deputy Rickell, not because the County forbade them for signing up for overtime work.

15

### c. *Freeway Therapy*

Robert described freeway therapy as a punishment in which deputies are "given extended driving assignments." There is no proof that Robert was given an extended driving assignment, such as patrolling streets and highways in a cruiser for eight hours per day while recovering from a back injury. Rather, he went to a light-duty job at Union Station, a 45-minute train ride from the Chatsworth Metrolink station where he normally works.[4] It is unrefuted that the technician job Robert coveted in Chatsworth is a part-time civilian job. Robert works as a full-time deputy, not as a part-time civilian. The transfer to Union Station was temporary, to accommodate Robert's injury: as soon as his physician released him from light-duty status, he immediately resumed his position at Chatsworth. Robert's freeway therapy claim is frivolous.

### d. *Medal of Valor*

Appellants complain that "they were denied the medal of valor for their heroic efforts during the 2008 Chatsworth train collision." Medals of valor are given to those who risk their lives to save others. Approximately 100 people from the Sheriff's Department responded to the crash scene. Five medals went to the "first of the first responders" who carried people off the burning train. Three of the medals went to individuals who arrived before the Lyznicks. Without knowing which employees were more heroic than others, no trier of fact could reasonably link the Lyznicks' failure to receive the award to Robert's sexual harassment claim.

In any event, this claim is not proof of an adverse employment action that materially changes the employee's status. Failure to give an employee an award for acts of bravery "does not qualify as the type of objective, tangible harm akin to 'firing' or 'a significant change in benefits' that is obviously materially adverse." (*Bridgeforth v. Jewell* (D.C.Cir. 2013) 721 F.3d 661, 663.) There is inherent uncertainty in the awards process, and failure to earn an award does not significantly change an employee's

---

[4]http://www.metrolinktrains.com/schedules/line/name/Ventura%20County/service_id/1141.html

16

responsibilities or opportunities in an objectively tangible way.  (*Douglas v. Preston* (D.C.Cir. 2009) 559 F.3d 549, 553.)

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.


17