Filed 6/6/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DALE BEEBE,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>WONDERFUL PISTACHIOS & ALMONDS LLC et al.,<br><br>    Defendants and Respondents;<br><br>INSURANCE COMPANY OF THE WEST,<br><br>    Intervener and Respondent. | F083502<br><br>(Super. Ct. No. BCV-17-102664)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County. David R. Lampe, Judge.

Hacker Law Group and Jeffrey A. Hacker, for Plaintiff and Appellant.

Roll Law Group, Courtney E. Vaudreuil, Matthew Moran, Rhonda Steffen, for Defendants and Respondents.

-ooOoo-

Plaintiff Dale Beebe worked as an electrical foreman for Braaten Electric, Inc. Braaten Electric, Inc. was hired as a subcontractor by defendant Potential Design, Inc. and its owner, defendant James Tjerrild, to work on electrical installations for two successive silo construction projects, at a nut facility in Firebaugh that was owned and operated by defendant Wonderful Pistachios and Almonds, LLC. Potential Design, Inc. was the general contractor for both construction projects.

The nut facility was plagued by flocks of migrating swallows that roosted, over several years, under the roof of an open, barn-like structure (the pole barn), and created sizable accumulations of bird feces. Sometime after Beebe's work at the nut facility was finished, he was diagnosed with a fungal infection, histoplasmosis, which had spread to his brain, resulting in certain permanent impairments. Histoplasmosis is caused by inhalation of airborne spores of a fungus called histoplasma capsulatum or H. capsulatum. Histoplasma capsulatum thrives in soils that are heavily enriched with bird feces.

Beebe eventually sued the defendants in tort, alleging their conduct with respect to the bird infestation and accumulation of bird feces at the nut facility was a substantial factor in causing his histoplasmosis. The defendants filed a motion for summary judgment and, subsequently, objected to the declarations of Beebe's infectious diseases expert and his standard of care expert, that were submitted in support of his opposition to the motion for summary judgment. The trial court excluded the declarations of Beebe's experts and granted the defendants' motion for summary judgment.

Beebe appealed. He challenges the trial court's rulings excluding his experts' declarations and granting summary judgment in favor of the defendants. We conclude the trial court erred in excluding the declarations submitted by Beebe's experts and, further, that summary judgment is not warranted here. We reverse the judgment and remand for further proceedings.

## PROCEDURAL BACKGROUND

Wonderful Pistachios and Almonds, LLC, owns and operates a pistachio processing facility in Firebaugh (Firebaugh Facility). The Firebaugh Facility underwent construction work beginning in 2011, when nut storage silos and associated electrical installations were added to the property. Wonderful Pistachios and Almonds, LLC, hired Potential Design, Inc. as the general contractor for the construction projects; James Tjerrild was the owner of Potential Design, Inc. Potential Design, Inc. subcontracted to Braaten Electric, Inc. (Braaten or Braaten Electric), the electrical work for the construction projects at the Firebaugh Facility.

Dale Beebe was an employee of Braaten and was assigned to oversee, as an electrical automation foreman, the electrical work associated with the construction projects at the Firebaugh Facility. Beebe worked as an electrical foreman at the Firebaugh Facility for two separate, extended periods of time: January 13, 2012 to December 20, 2012 (phase one), and September 12, 2013 to September 26, 2014 (phase two). Collectively, Beebe worked at the Firebaugh Facility for almost two years between 2012 and 2014. During the periods Beebe worked at the Firebaugh Facility, he lived onsite, in his recreational vehicle (RV).

Beebe filed the complaint initiating this matter in the Kern County Superior Court on November 14, 2017. On June 8, 2018, Beebe filed a first amended complaint (complaint or operative complaint). Wonderful Pistachios and Almonds, LLC, Potential Design, Inc., and James Tjerrild (owner of Potential Design, Inc.), were the defendants. All defendants (collectively, Wonderful) were represented by the same counsel in the trial court (and on appeal).

Beebe's operative complaint alleged: "Over a period of time, and while Plaintiff was working at Defendant's Facility, a toxic substance or toxic substances (believed to have been bird feces) was allowed to accumulate at Defendant's Facility." The complaint added: "In or about September 2014, while Plaintiff was at Defendant's Facility,

3.

Defendants, and each of them, engaged in removal, remediation and/or clean-up of the toxic substance(s) including, but not limited to, performing hydro-blasting. Plaintiff is informed and believes and based thereon alleges that Defendants' actions caused spores of the toxic substance(s) to become airborne within the Defendant's Facility, exposing Plaintiff to the toxic substance(s)."

The complaint alleged: "The toxic substance(s) were allowed to accumulate and become airborne by Defendants' actions and/or omissions herein. The substance(s) contained fungi including, but not limited to, Histoplasma Capsulatum. Plaintiff is informed and believes and based thereon alleges that when inhaled, said substance(s) caused Plaintiff's lung infection which spread to other parts of Plaintiff's body." The complaint further noted: "On or about November 24, 2015, Plaintiff reported to the hospital due to symptoms including, but not limited to, weakness and numbness in his extremities. Plaintiff was admitted to the hospital and imaging scans were performed. Subsequently, lesions were discovered on, among other locations, Plaintiff's brain, such that Plaintiff required surgical intervention. The lesions were biopsied in or about February 2016. Plaintiff was then diagnosed with Histoplasmosis."

The complaint asserted five causes of action against all defendants: negligence, negligence per se, premises liability, strict liability (based on ultrahazardous activity), and nuisance. The complaint sought various categories of damages.

On April 21, 2021, Wonderful filed a motion for summary judgment/summary adjudication as to the operative complaint, along with supporting declarations from, among others, two retained experts (Dr. Chadi Hage and Ben Kollmeyer). Among other contentions, Wonderful argued, with respect to all the causes of action, that Beebe had not established Wonderful's "conduct proximately caused his alleged injuries." Beebe opposed Wonderful's motion for summary judgment, adducing supporting declarations from two retained experts (Dr. Rasha Kuran and Dr. Diane Trainor), among other evidence. The trial court heard argument on the motion for summary judgment on July 7,

4.

2021, and on August 6, 2021, issued its final ruling. The court granted Wonderful's objections to the declarations of Beebe's experts and found there was no "triable issue of fact on the issue of causation." The court granted summary judgment in favor of Wonderful (on Beebe's complaint). This appeal followed.

## FACTUAL BACKGROUND

### I. Declaration Evidence Adduced by the Parties

*Declaration of Conan Dunlap*

Conan Dunlap became the general manager of the Firebaugh Facility in 2012. Dunlap was deposed during the discovery phase of this matter (see below); Dunlap also provided a declaration in support of Wonderful's motion for summary judgment. Dunlap noted in his declaration: "At the time construction of the storage silos [at the Firebaugh Facility] began, there was an existing structure consisting of posts on a cement foundation with a metal roof and no walls, referred to as the 'pole barn.' Before construction began, the pole barn had provided shelter for migrating birds who would build their nests under its roof each spring. Beneath the nests, there was an accumulation of droppings. This accumulation was removed in early 2012. In 2013 and 2014, some birds returned to the pole barn in the spring and, thus, there were some droppings on the concrete. However, these droppings [were] periodically removed by Defendants."

Dunlap declared, with respect to the number of workers at the Firebaugh Facility: "Between January 2012 and December 2012, WP&A [Wonderful Pistachios & Almonds, LLC.] employed approximately twelve workers at the Firebaugh Plant. WP&A employed approximately forty-five workers at its Firebaugh Plant during the September 2013 to September 2014 time period."

*Declaration of Ben Kollmeyer and Attached Exhibits*

Ben Kollmeyer, a certified industrial hygienist, also provided a declaration in support of Wonderful's motion for summary judgment. Kollmeyer declared: "Histoplasmosis is an illness caused by the naturally occurring soil fungus *Histoplasma*

*capsulatum* (herein referred to as Histoplasma).… Histoplasmosis is not a reportable disease in California and is generally not recognized as endemic to California. Bird and bat droppings can act as a nutrient source for the growth of *Histoplasma* already present in soil. Whereas bats can be infected with and secrete the fungus, birds themselves do not appear to be infected by the fungus but may transport its spores from one place to another on wings, feet or beaks." Kollmeyer noted: "Individuals who become ill [with Histoplasmosis] are typically exposed by inhaling airborne spores of *Histoplasma*. The illness does not spread from person to person." Kollmeyer added: "Despite the attention given to outbreaks, most cases of histoplasmosis occur sporadically (i.e., not associated with other cases)."

Kollmeyer observed: "Since *Histoplasma* is not known to be present in all soil and droppings, and it is readily mobile in air when disturbed, the specific location or source of an individual's exposure cannot be determined absent scientific data (e.g., testing data, associated cases) supporting the existence, or likely existence, of the fungus in the soil or droppings at issue at the time of exposure." Kollmeyer further observed: "I have not seen sampling data indicating the presence of *Histoplasma* in soil or droppings at the Firebaugh site at the time Plaintiff was present or evidence indicating the existence of other cases of histoplasmosis associated with the Firebaugh site at [the] time Plaintiff was present." Kollmeyer noted that during the period after Beebe last worked at the Firebaugh Facility (September 26, 2014) and the time he was hospitalized for brain lesions from histoplasmosis (November 25, 2015), he had worked at "approximately 40 different project sites" in "13 different counties in California." Kollmeyer declared that, in light of the above facts, "the origin of the *Histoplasma* spore(s) that caused Plaintiff's histoplasmosis cannot be determined."

Kollmeyer, for purposes of his declaration, relied on "numerous research articles and documents concerning histoplasmosis," including a 2004 article entitled "*Histoplasmosis: Protecting Workers at Risk*," that was issued by the United States

6.

Centers for Disease Control and Prevention (CDC). (Cal. Centers for Disease Control & Prevention, Histoplasmosis: Protecting Workers at Risk (Dec. 2004) p. 1 (CDC article).) This article was attached as an exhibit to Kollmeyer's declaration. The CDC article provides, in part: "Histoplasmosis primarily affects a person's lungs, and its symptoms vary greatly. *The vast majority of infected people are asymptomatic* (*have no apparent ill effects), or they experience symptoms so mild they do not seek medical attention and may not even realize that their illness was histoplasmosis*." (*Ibid.*, italics added.) The article states: "Histoplasmosis can appear as a mild, flu-like respiratory illness and has a combination of symptoms, including malaise (a general ill feeling), fever, chest pain, dry or nonproductive cough, headache, loss of appetite, shortness of breath, joint and muscle pains, chills, and hoarseness." (*Ibid.*)

The CDC article further notes: "Chronic lung disease due to histoplasmosis resembles tuberculosis and can worsen over months or years. Special antifungal medications are needed to arrest the disease." (Cal. Centers for Disease Control & Prevention, Histoplasmosis: Protecting Workers at Risk, *supra*, at p. 1.) The article adds: "The most severe and rarest form of this disease is disseminated histoplasmosis, which involves spreading of the fungus to other organs outside the lungs. Disseminated histoplasmosis is fatal if untreated, but death can also occur in some patients even when medical treatment is received." (*Ibid.*, fns. omitted.) The article states: "After an exposure, how ill a person becomes varies greatly and most likely depends on the number of spores inhaled and a person's age and susceptibility to the disease. The number of inhaled spores needed to cause disease is unknown.… [L]onger durations of exposure and exposure to higher concentrations of airborne contaminated material increase a person's risk of developing histoplasmosis." (*Ibid.*, fns. omitted.) The article notes: "A person who has had histoplasmosis can experience reinfection after reexposure to *H. capsulatum*." (*Ibid.*)

The CDC article states: "The [*H. capsulatum*] fungus seems to grow best in soils having a high nitrogen content, especially those enriched with bird manure or bat droppings. The organism can be carried on the wings, feet, and beaks of birds and infect soil under roosting sites or manure accumulations inside or outside buildings. [For example,] [a]ctive and inactive roosts of blackbirds … have been found heavily contaminated by *H. capsulatum*. Therefore, the soil in a stand of trees where blackbirds have roosted for 3 or more years should be suspected of being contaminated by the fungus. Habitats of pigeons and bats, and poultry houses with dirt floors have also been found contaminated by *H. capsulatum*." (Cal. Centers for Disease Control & Prevention, Histoplasmosis: Protecting Workers at Risk, *supra*, at p. 1, fns. omitted.)

The CDC article notes: "If a colony of bats or a flock of birds is allowed to live in a building or a stand of trees, their manure will accumulate and create a health risk for anyone who enters the roosting area and disturbs the material. [¶] Areas known or suspected of being contaminated by *H. capsulatum*, such as bird roosts, attics, or even entire buildings that contain accumulations of bat or bird manure, should be posted with signs warning of the health risk.… In some situations, a fence may need to be built around a property or locks put on attic doors to prevent unsuspecting or unprotected individuals from entering." (Cal. Centers for Disease Control & Prevention, Histoplasmosis: Protecting Workers at Risk, *supra*, at p. 7.)

The CDC article explains: "The best way to prevent exposure to *H. capsulatum* spores is to avoid situations where material that might be contaminated can become aerosolized and subsequently inhaled. A brief inhalation exposure to highly contaminated dust may be all that is needed to cause infection and subsequent development of histoplasmosis. Therefore, work practices and dust control measures that eliminate or reduce dust generation during the removal of bat or bird manure from a building will also reduce risks of infection and subsequent development of disease." (Cal. Centers for Disease Control & Prevention, Histoplasmosis: Protecting Workers at

Risk, *supra*, at p. 7.)  The article adds:  "For example, instead of shoveling or sweeping dry, dusty material, carefully wetting it with a water spray can reduce the amount of dust aerosolized during an activity.  Adding a surfactant or wetting agent to the water might reduce further the amount of aerosolized dust.  Once the material is wetted, it can be collected in double, heavy-duty plastic bags, a 55-gallon drum, or some other secure container for immediate disposal.  An alternative method is use of an industrial vacuum cleaner with a high-efficiency filter to 'bag' contaminated material."  (*Ibid*., fns. omitted.)

### Declaration of Dr. Chadi Hage

Dr. Chadi Hage provided a declaration in support of Wonderful's motion for summary judgment.  Dr. Hage is an associate professor of clinical medicine at Indiana University School of Medicine.  Dr. Hage is "board-certified in infectious diseases, pulmonary medicine and critical care medicine."  Dr. Hage declared:  "I am currently treating 5-7 patients diagnosed with histoplasmosis.…  I treat on average 10 patients per year who have contracted histoplasmosis.  Regarding my histoplasmosis patients, I am responsible for diagnosis, treatment and follow-up care which can last several months."  Dr. Hage noted:  "Any activity that disturbs material contaminated with *H. capsulatum* can cause the spores to float into the air and potentially infect people," as in activities such as construction and the "disturbance of [a] large accumulation of bat or bird droppings (including the droppings from chickens, pigeons, blackbirds and other birds) which are contaminated with *H. capsulatum*."  Dr. Hage added that histoplasmosis is "rare in California."

Dr. Hage addressed the issue necessitating his expert declaration:  "It is my understanding [that] bird droppings were present on [WP&A's] Firebaugh property at several locations between 2012-2014.  It is also my understanding that Plaintiff alleges he inhaled *H. capsulatum* fungi spores as a result of the bird droppings being removed, remediated and/or cleaned-up at the Firebaugh plant."  Dr. Hage noted:  "It is my opinion to a reasonable degree of medical probability that Plaintiff did not get infected with *H.*

9.

*capsulatum* at the Firebaugh plant. My opinion is based on the following factors: (1) the passage of time between Plaintiff working at the Firebaugh plant and the onset of his symptoms nearly 14 months later, (2) the absence of any other workers at the Firebaugh plant being diagnosed with histoplasmosis (i.e., a 'hot spot,' which is generally defined as a high rate of infection, 50% or more, after exposure); and (3) Plaintiff's diagnosis with progressive disseminated histoplasmosis rather than acute histoplasmosis." Dr. Hage observed the typical incubation period of histoplasmosis is relatively short, for example "3 to 17 days." He added it was his "opinion to a reasonable degree of medical probability that Plaintiff's exposure to H. capsulatum took place in the 4-6 weeks prior to the onset of his symptoms in November 2015." He further added: "A diagnosis of disseminated histoplasmosis requires a significant exposure to H. capsulatum much closer in time than fourteen months (Mr. Beebe's last time working at Firebaugh) to the onset of his symptoms."

Dr. Hage observed: "It is my understanding that no tests of any kind were conducted on the soil or bird droppings present at the Firebaugh plant during the time period that Plaintiff worked there. Thus, there is no way to confirm *H. capsulatum* was ever in the soil or bird droppings at the Firebaugh plant during the time period Plaintiff was there.… *Whether positive or negative, non-contemporaneous testing results are irrelevant to whether Mr. Beebe acquired the histoplasmosis while working at the Firebaugh plant given the time lapse between alleged exposure and testing*." (Italics added.) Dr. Hage noted that Beebe had worked on many job sites in 13 California counties in the period between the completion of his work at the Firebaugh facility and his hospitalization for histoplasmosis, and had traveled internationally, snorkeled, gone boating, and golfed as well. Dr. Hage postulated that Beebe could potentially have contracted histoplasmosis through those activities.

***Declaration of Dale Beebe***

Beebe, 58, submitted a declaration in support of his opposition to Wonderful's motion for summary judgment. Beebe had been a "heavy smoker" since the age of 16. Beebe declared: "I did not come in contact with nor was I exposed to bird feces in any of the jobs or locations that I worked at after I completed my work at Defendant's Firebaugh facility at the end of September, 2014. I don't even remember any birds or bird nests being present." Beebe noted: "I did not come in contact with nor was I exposed to bird feces at any time between September, 2014 and November 25, 2015 when I was rushed to the hospital." Beebe further noted: "As I look back and now that I have become a little more knowledgeable about the disease I have, I realize that I had symptoms of Histoplasmosis while I still worked at Firebaugh, particularly in the four months or so before I stopped working there in September, 2014. I had flu like symptoms. I had a cold. I felt run-down. I had headaches. I was in a funk and tired all the time. I was forgetful. I experienced weight loss. I had a cough … I experienced these same symptoms at other times when I worked at Firebaugh. However, I thought nothing of them. I did not see a doctor and the symptoms went away after a few days. I experienced these symptoms from time to time after I left Firebaugh, but they would also disappear after a few days and I did not seek medical care."

***Declaration of Dr. Rasha Kuran***

Dr. Rasha Kuran, an expert in infectious diseases as well as Beebe's treating physician, submitted a declaration in support of Beebe's opposition to Wonderful's motion for summary judgment. Dr. Kuran is "an assistant professor of Health Sciences at UCLA, David Geffen School of Medicine," and Associate Medical Director of the Valley Fever Institute at Kern Medical Center. Dr. Kuran relied on her "education, background, training, and experience" in formulating and reaching her opinions and conclusions; in addition, she reviewed and relied upon "various articles concerning histoplasmosis,"

11.

including a 1958 article by Manos, Ferebee, and Kerschbaum and two articles, from 1980 and 1981 respectively, by Goodwin, et al.[1]

Dr. Kuran declared: "Since I moved to Kern County, I have seen 2 histoplasma brain abscesses, 3 chronic progressive histoplasmosis cases, and at least two acute progressive severe histoplasmosis [cases]." Dr. Kuran added: "Histoplasmosis is under-diagnosed in California. The only accurate way to measure true prevalence is by performing skin testing of random people to detect whether they had been infected with it at one point in their life. This was only done once by Manos et al. ([M]anos 1956)." Dr. Kuran observed, based on the 1956 Manos article, that "histoplasmosis is endemic to the San Joaquin Valley," such that in "the area at and surrounding Firebaugh," "up to 60% of residents" could "have some form of histoplasma infection." Dr. Kuran reproduced a map from the Manos article in her declaration, that showed the San Joaquin Valley had a relatively high incidence of H. capsulatum/histoplasmosis.

Dr. Kuran confirmed that when Beebe was hospitalized, his MRI scan showed two brain lesions and that a "culture" of his brain tissue subsequently tested positive for histoplasma capsulatum. She stated, "[h]is brain lesions, while sterilized with multiple long-term medications, left permanent damage leading to difficulty with ambulation, coordination, memory, and cognition, among other things." She added: "Infections can spread outside the lungs and into other body organs, termed Progressive Histoplasmosis." Dr. Kuran observed: "Upon questioning, Mr. Beebe reported having had significant exposure to bird droppings while at a job in Firebaugh. He especially recalled a 'pole barn' covered and caked with layers and layers of bird droppings that, when swept created dust which, along with the bird fecal matter, he and his co-workers inhaled."

---

[1]    Manos et al., Geographic Variation in the Prevalence of Histoplasmin Sensitivity (1956) [in an evident typographical error, Dr. Kuran initially noted the Manos article was published in 1958]; Goodwin et al., Disseminated Histoplasmosis Clinical and Pathologic Correlations (1980); Goodwin et al., Histoplasmosis in Normal Hosts (1981).

12.

Dr. Kuran noted: "The majority of histoplasmosis infections occur without symptoms, >90%. Those who do get symptoms most commonly manifest with acute pulmonary disease within 7-21 days, but this is not always the case.… Some patients would not necessarily experience chest symptoms initially and go on to develop disseminated infection." As for her patients who were diagnosed with histoplasmosis, Dr. Kuran pointed out that "most have suffered lengthy periods of time being undiagnosed, just like Mr. Beebe." Dr. Kuran expressly "disagree[d] with Dr. Hage that Mr. Beebe's symptoms had to demonstrate within 7-21 days of exposure and … Dr. Hage's comments [that] non-reported symptoms means that Mr. Beebe did not contract histoplasmosis when he worked at the Firebaugh facility." Among other things, Dr. Kuran cited the 1981 Goodwin article (it appears Dr. Kuran meant to refer to the *1980* Goodwin article) as clarifying that disseminated histoplasmosis infection has three variations: acute progressive (infantile); subacute progressive disseminated; and chronic progressive disseminated. Dr. Kuran stated, relying in part on the article: "Mr. Beebe's case falls into the subacute progressive disseminated category, which … typically manifests within 2-24 months of infection."

Dr. Kuran opined: "Based on my education, Mr. Beebe's history, testing, examination, treatment, intimate knowledge of his case, and general infectious disease experience, it is my medical opinion to a reasonable medical certainty that Mr. Beebe acquired histoplasmosis during his exposure to the bird feces while at WP&A's facility in Firebaugh, California." Dr. Kuran also explained that "[c]asual exposure to fresh bird droppings or droppings on the sidewalk is not sufficient to cause histoplasmosis." Rather, "[e]xposure that leads to infection" is "usually attained by inhaling disturbed soil that had bird and/or bat droppings for a long time allowing the fungus to grow in that soil."

Activities that are "more likely to cause a person to contract histoplasmosis," include sweeping of bird droppings, cleaning a chicken roost or coop, or exploring caves

with exposed bat droppings. While Beebe had worked at the Firebaugh facility "on an almost continuous basis for close to two years" (where bird feces were regularly swept off or blown off the concrete floor of the pole barn and into the surrounding dirt (see below)), there was no evidence he participated, at any time, in activities like cleaning chicken coops or exploring bat-infested caves. Based on those facts, Dr. Kuran further opined, "to a reasonable medical certainty," that Beebe's histoplasmosis infection did not arise from his travel, recreational, and post-Firebaugh work activities.

Dr. Kuran concluded: "It is my medical opinion to a reasonable medical certainty that Mr. Beebe's disseminated histoplasmosis was caused by his exposure to bird feces at the Plant at Firebaugh when he worked there in 2013 and 2014. From a medical perspective, it is irrelevant to me that the soil was not tested for the spores. There is overwhelming evidence from my review of materials that Mr. Beebe's exposure to the bird feces and soil at the Plant was the cause of his disseminated histoplasmosis."

***Declaration of Diane Trainor, PhD***.

Diane Trainor, Ph.D. in Occupational Safety and Health from N.Y.U., is an occupational safety and health expert. Trainor provided a declaration in support of Beebe's opposition to Wonderful's motion for summary judgment. Trainor stated she was "familiar with the standard of care for how to handle and remove bird feces between 2012-2014 in California." Trainor observed: "The accepted industry standards required that no *dry* sweeping or clean-up occur[,] as this method of feces clean-up aerosolizes the fecal matter into the breathing zone of workers." (Italics added.) Industry standards also "require double bagging of bird feces and proper disposal," with plastic bags used for this purpose.

Trainor stated "[t]he pathogen hazards contained in bird fecal matter and the increased risk of exposure created a dangerous condition" at the Firebaugh Facility. She stated: "WP&A did not follow standards established for the proper removal of bird feces, by scraping and dry sweeping the feces, therefore creating a dangerous condition to

14.

which Beebe was exposed." Trainor noted that under the standard of care, WP&A should have investigated the health risks posed by bird feces and consulted with a professional, such as an occupational safety and health specialist or an industrial hygienist, and "hire[d] professionals to remove the bird feces according to standard industry practices." Trainor further noted that "Defendants should have, at a minimum, tested the soil and bird feces."

Trainor stated: "The risk associated with exposure to bird feces is well-documented and WP&A had a responsibility to provide a clean, work environment from the hazard of Histoplasmosis." Trainor concluded: "The exposure to bird feces and the subsequent development of Histoplasmosis was foreseeable. WP&A['s] failure to mitigate the foreseeable hazard of bird feces was a cause of exposure and injury to Dale Beebe."

## II.    Deposition Testimony Adduced by the Parties

### *Deposition Testimony of Conan Dunlap*

As indicated above, Conan Dunlap was the general manager of the Firebaugh Facility for WP&A. Dunlap testified at deposition that the presence of roosting birds was an ongoing problem at the Firebaugh Facility during the timeframe relevant to Beebe's complaint. Dunlap testified: "We knew that there were birds nesting in the pole barn, so we had discussions on how to discourage them from being there." At the beginning of the construction work, Dunlap asked James Tjerrild of Potential Design, Inc. to "clean up the bird nests at the pole barn" and Tjerrild did so; but the birds came back.

The birds were there when Braaten Electric was working at the Firebaugh Facility in 2012; the electrical work was being done in the pole barn area and the silo area. WP&A "tried a number of different strategies" to reduce the number of nesting birds. Dunlap testified: "We set up electronic bird calls that made predator bird noises to try to scare them. We knocked down incomplete nests to not allow them to complete their nests. Eventually, we hired a falconer to come out and dissuade the birds. We also

15.

approved netting to try to physically keep the birds from nesting." In addition, WP&A deployed a fake owl or fake hawk to scare off the birds; WP&A also tried using "propane-powered canons" to make a noise to scare the birds away.

However, the birds were back when Braaten Electric returned to perform phase two of the electric work. Dunlap was asked whether the earlier problems continued to persist in 2013, in phase two of the construction; Dunlap answered in the affirmative. Starting in 2013, WP&A brought in a company called Air Strike Bird Control to deal with the bird problem. During both phases of the construction work, WP&A would "periodically" sweep the bird droppings in the pole barn with a broom. Dry sweeping was the "primary method" used to move the bird feces off the concrete. The bird droppings were "just swept off the concrete" and "into the dirt"; the droppings were not bagged up or otherwise removed or discarded. Dunlap stated: "I don't know what happens to them on the dirt. Material changes." Dunlap was asked whether bird droppings covered equipment at the Firebaugh Facility; Dunlap answered: "I don't recall specifically, but generally I'm sure there was bird droppings on catwalks and things." Dunlap could not provide an estimate for the number of birds present in the pole barn in 2014. Dunlap was asked whether the bird feces accumulation was an ongoing problem in 2015; Dunlap answered: "I don't recall. I don't think [so]. I think they were gone by 2015."

WP&A did not consult with experts regarding the best way to clean up and dispose of bird feces to minimize the risk of aerosolization of bird feces and their subsequent inhalation. WP&A did not use an industrial vacuum cleaner to remove the bird feces; nor did WP&A utilize disinfectants. WP&A did not conduct any testing or evaluation with regard to the bird feces contamination. WP&A did not post signs regarding potential health hazards related to bird feces.

16.

*Deposition Testimony of James William Tjerrild*

James William Tjerrild was the owner of Potential Design, Inc. that subcontracted with Braaten for electrical installation work in two phases at the Firebaugh Facility. During both phases, Beebe worked fulltime at the Firebaugh Facility and lived in his RV on site, near the pole barn.

There were birds at the Firebaugh Facility and "the majority of the birds were in the pole barn"; they would nest in the pole barn until they flew away to the northeast. The birds were swallows; there were also sparrows, blackbirds, and crows. Conan Dunlap hired Potential Design, Inc. to "remove the bird nests from underneath the pole barn," in either "late 2011 or early 2012." Tjerrild testified: "[W]e used a man lift and a pressure washer and a shovel and a crew of two and we cleaned all of the swallow nests off the bottom of the pole barn." Tjerrild was asked: "And what did you do with the waste that came from that?" Tjerrild answered: "It all landed on the ground of the floor of the pole barn and Wonderful employees handled that." Tjerrild was asked: "So what were you using the pressure washer and the shovel for?" He responded: "So the swallows make a mud little nest [*sic*] that's adhered to the bottom of the metal panels that make up the roof of the pole barn. And the pressure washer, you just wand the pressure washer at the swallow nests and it softens them up. And after you wand them, it dampens them. And once you get them just a little bit wet, then you take a square shovel, turn it upside down and run it across the roof, and the swallow nests fall off." Tjerrild was asked: "So it's your testimony that [Potential Design, Inc.] knocked everything down, but then didn't clean it up; correct?" Tjerrild replied: "Correct. That was the scope of our work." Tjerrild was not asked to remove the bird droppings and feces and nor did he.

*Deposition Testimony of Danny Dovell*

Danny Dovell testified at deposition that he had worked for Braaten Electric for 17 years. He worked as an electrician hand and an electrician during phase one and phase

two, respectively, of the construction at the Firebaugh Facility. Dovell shared an onsite trailer with another Braaten employee. "There was a lot of birds there." "There was a lot of pigeons and a lot of swallows. They would be flying over your head all the time." Bird feces were also present; "[t]hey were everywhere." Asked to describe the feces, Dovell said: "Bad. Real bad. Whenever you got the trailers … where they had all their superintendents' trailers and stuff like that over there. They were covered with [bird feces]." The birds were all over Braaten's equipment. Dovell said: "Some of the boxes we do we run all our wire into, up on top, the catwalk, the birds made nests in there and our exhaust fans, they would get inside of there and make nests inside of those. One side has a screen and the other side didn't. They were able to get inside of them."

Dovell was asked: "Do you remember whether or not you would eat in the presence of the birds?" Dovell answered: "Yes. They had a couple barbecues there. One was underneath the shed I was telling you about where the birds were." Beebe would attend the barbecues.

### *Deposition Testimony of Robert Simons*

Robert Simons was a Braaten employee who worked with Beebe at the Firebaugh Facility for five to seven months. The Braaten employees would be on site 24 hours a day, living in RVs, and eating at barbecues set up next to the RVs. There were birds at the Facility, "[f]rom pigeons to [r]avens, crows, an[d] like little swallow birds." Simons noted: "[T]hey were just everywhere[,] we were always shooing birds away." "They were a pretty big problem." "[T]hey would be on top of the switch gears and panel outside." Simons explained: "[T]here was just bird, I guess, fecal, feces everywhere.… [T]hey can [get] pretty thick, [on] some of the switch gears [the bird poop] would be an inch or two high." Simons said: "Almost like bird poop snow, I guess I would say, it was." The Braaten employees would have to "wipe[] things out of the way with [their] gloves on so [they could] access things," and sometimes they would have to sweep an

area just to be able to work there.  WP&A brought in a falcon to "try to get rid of birds," but "[i]t didn't have much effect."

Simons noticed changes in Beebe towards the end of Simons's time on the project. Simons said:  "[Beebe] seemed to be a little slower towards the end of when I left … the project.  He'd have to process things more."  Simons had to help Beebe get routine things done, like ordering materials.  Beebe became "[f]orgetful and unsteady on his feet a little bit."  Simons noted:  "I think he was taking like NyQuil, just different things.  I thought [he] might like have an ear infection since his equilibrium was feeling kind of funny, things like that.  Like he might have had a cold."

### *Deposition Testimony of Rene Castaneda*

Rene Castaneda used to work for WP&A, at the Firebaugh Facility.  Castaneda was questioned about phase one of the construction at the Firebaugh Facility.  Castaneda saw birds in the silo area and in the pole barn "[e]very day during the spring and summer."  Similarly, Castaneda saw bird nests everyday in the silo area and the pole barn, during the spring and summer.  Castaneda also saw bird poop in the silo area and pole barn every day, during the spring and summer.  In the silo area, the bird poop was "on the ground or the sides of the silos."  In the pole barn, the bird poop was "[o]n the sides of the poles and the ground."  Castaneda was part of a crew that would knock down the birds' nests "[o]n a daily basis."  Castaneda testified:  "We'd get on a man lift with a pole, with the – like a spatula-type tool at the end, and we'd just raise ourselves up and scrape the – scrape the nests off."  The nests would fall to the ground.

### *Deposition Testimony of Francisco Cipriano Gamino*

Francisco Cipriano Gamino, an employee of WP&A, worked at the Firebaugh Facility.  Gamino was part of a crew of six or seven workers that would remove bird nests from the pole barn.  The workers "would go up on the boom lift and try to wash [the nests] down with the hose."  Gamino testified:  "So we did the bird nest a couple times. And then we would do the floor.  Mostly we would, like I said, clean the floor with all the

air, with the leaf blowers.  That's what we would mostly do.  But I do remember us washing – trying to scare the birds away with the hose."  Gamino said cleaning the floor with the leaf blowers "was a daily thing."  Gamino was asked:  "Was the area in which you used the leaf blowers the same area where you would be cleaning the floor after you knocked down the bird nest?"  Gamino responded "Yes."

### *Deposition Testimony of Dale Beebe*

Dale Beebe testified at deposition that he worked as an electrical automation foreman since he joined Braaten Electric in 2004.  Beebe worked and lived at the Firebaugh Facility during phases one and two of the construction there (he would generally go home to Bakersfield on weekends).  Beebe would work under the pole barn.  There were birds nesting in the pole barn—mud-nesting birds and crows.  Beebe was asked:  "Now, the birds that do the mud nests, how many of those did you see?"  Beebe answered:  "There were a lot.  You want me to give you an estimate?  Hundreds."  During both phases of the work, the Braaten employees would talk among themselves "about how many birds there were and how nasty it was"; they would be upset about the "nasty working conditions."  Beebe noted the birds "were there the whole time [he] was there"; he also saw the crows "all the time."  There were bird droppings on Beebe's RV.  The same number of birds were there when Beebe returned for phase two of the work, in September 2013.

### *Deposition Testimony of Dr. Chadi Hage, Wonderful's Medical Expert*

Dr. Chadi Hage testified at deposition that histoplasmosis primarily affects a person's lungs, but its symptoms vary greatly.  The vast majority of affected people are asymptomatic and have no apparent ill effects.  Histoplasmosis can have a combination of symptoms, including a general ill feeling, fever, chest pain, dry or nonproductive cough, loss of appetite, shortness of breath, joint and muscle pain, chills and hoarse voice.  A person who has been a heavy smoker would be more susceptible to severe

20.

symptoms and disseminated disease, just like an immunocompromised person would be. Beebe had disseminated disease, specifically "histoplasmosis of the brain."

H. capsulatum grows best in soils with a high nitrogen content, especially those enriched with bird manure or bat droppings. In geographic areas where H. capsulatum is relatively common, if birds had roosted in a particular location for three or more years, that area would likely be contaminated with the fungus.[2] Dr. Hage testified, "California is not part of the endemic map for histoplasmosis."

In an area with H. capsulatum, "there is a correlation between the amount of spores that are aerosolized and the likelihood of developing histoplasmosis as well as the severity of the illness." The number of spores that have to be inhaled to cause the disease in a human being is unknown. Dr. Hage explained the typical course of the disease: "What happens, the natural history, the way we understand it is that a person is infected with Histoplasma. It goes to the lung. The lung tries to contain it and it struggles with it. And then it disseminates from there to the rest of the body in everybody. [¶] But then the immune system takes about two weeks to develop enough defenses against it to contain it. And this is how it's contained in healthy individuals." However, the duration and timing of the disease varies depending on a person's immune system, along with other factors.

***Deposition Testimony of Ben Kollmeyer***

Ben Kollmeyer testified that histoplasmosis does occur in California and there have been cases in the Central Valley. The fungus that causes histoplasmosis, H. capsulatum, can be found in bird droppings or bird fecal matter. The fungus can also be transported from one place to another by birds, on their wings, feet, or beaks.

---

[2] Dr. Hage was asked: "Do you agree with the proposition that if birds have been roosting in the location for three or more years, that the area where the birds have roosted should be suspected of being contaminated with the fungus?" Dr. Hage answered: "Only in the right geographic area. So this would be correct in Indiana. But it would not be correct in Saudi Arabia."

## DISCUSSION

## I.      Summary Judgment Not Warranted with Respect to Issue of Causation

### A.      *Summary Judgment:  Standard of Review*

Any party may move for summary judgment in an action if it is contended that the action has no merit.  (Code Civ. Proc., § 437c, subd. (a).)

"Summary judgment is granted when there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).)  This court reviews de novo the trial court's decision to grant summary judgment and we are not bound by the trial court's stated reasons or rationales. [Citation.]  [¶]  In reviewing a motion for summary judgment, we accept as undisputed fact only those portions of the moving party's evidence that are uncontradicted by the opposing party.  In other words, the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn therefrom are accepted as true."  (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1001.)

We consider " 'all the evidence set forth in the moving and opposition papers except that to which objections were made and sustained.' "  (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1035, citation and quotation marks omitted.)  " 'We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' "  (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1249-1250.)

"[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law.  That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion thereon.  (See Evid. Code, § 500.)  There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party

22.

opposing the motion in accordance with the applicable standard of proof…. [A] plaintiff [moving for summary judgment] bears the burden of persuasion that 'each element of' the 'cause of action' in question has been 'proved,' and hence that 'there is no defense' thereto. (Code Civ. Proc., § 437c, subd. (o)(1).) A defendant [moving for summary judgment] bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto. (*Id.*, § 437c, subd. (o)(2).)" (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 850, fns. omitted.)

### B.    Applicable Legal Framework:  Causation

" ' "Causation" is an essential element of a tort action. Defendants are not liable unless their conduct … was a "legal cause" of plaintiff's injury.' " (*Whiteley v. Philip Morris, Inc*. (2004) 117 Cal.App.4th 635, 696 (*Whiteley*).) Here, the complaint raises five tort causes of action, all of which encompass an element of causation with respect to the injury alleged (histoplasmosis). (See, e.g., *Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917-918 [negligence]; *David v. Hernandez* (2014) 226 Cal.App.4th 578, 584 [negligence per se]; *Castellon v. U.S. Bancorp* (2013) 220 Cal.App.4th 994, 998 [premises liability]; *Garman v. Magic Chef, Inc*. (1981) 117 Cal.App.3d 634, 638 [strict liability]; *Wilson v. Southern California Edison Co*. (2018) 21 Cal.App.5th 786, 806 [nuisance].)

The "substantial factor" test for causation is appropriate in all tort actions. (See Haning, et al., *Cal. Practice Guide: Personal Injury* (The Rutter Group 2022) ¶ 2:2398 (*Cal. Practice Guide: Personal Injury*); see *Whiteley*, *supra*, 117 Cal.App.4th at p. 696 ["A tort is a legal cause of injury only when it is a substantial factor in producing the injury."].) " ' "The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." ' " (*Whiteley*, *supra*, at p. 699.) Thus, a force which plays only an " ' "infinitesimal" ' " or

" ' "theoretical" ' " part in bringing about the injury is not a substantial factor, but a " ' "very minor force that does cause harm is a substantial factor. " ' " (*Ibid.*)

Further, "[c]ausation is a question of *reasonable probability*; 'legal cause' need not be proved with certainty, but mere possibility is insufficient to establish a prima facie case. Thus, the issue is whether it is *more likely than not* that plaintiff's injury was a result of defendant's act or omission." (*Cal. Practice Guide: Personal Injury*, *supra*, ¶ 2:2405; *Whiteley*, *supra*, 117 Cal.App.4th at p. 699 [" 'Reasonable medical probability' requires more than showing a mere *possibility* that defendant's conduct was a 'substantial factor' in causing the injury."].)

"Similarly, where defendants were responsible for toxic waste that admittedly could increase a person's risk of contracting various maladies, plaintiffs must establish, to a *reasonable medical probability, their illnesses* were caused by the toxic exposure. [For example,] [t]he fact the [toxic substance] increased the possibility of sickness in the overall population does not suffice to provide a causal link with plaintiffs' illnesses." (*Cal. Practice Guide: Personal Injury*, *supra*, ¶ 2:2420 and ¶ 2.370 ["Expert testimony is … required on the issue of causation if the matter is so beyond lay experience that it can be explained *only* through experts."]; see *Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367, 1384 [" 'The law is well settled that in a personal injury action causation *must be proven within a reasonable medical probability based upon competent expert testimony.*' "]; *Whiteley*, *supra*, 117 Cal.App.4th at p. 701 ["Increased risk alone is not actionable. In toxic tort cases generally, 'plaintiffs must establish, to a *reasonable medical probability, their illnesses* were caused by the toxic exposure.' "].)

The trial court based its summary judgment ruling on *Miranda v. Bomel Construction Co., Inc*. (2010) 187 Cal.App.4th 1326 (*Miranda*). *Miranda* addressed the question whether a Valley Fever fungal infection experienced by the plaintiff in that case, was attributable to a construction dirt mound on property adjacent to the plaintiff's workplace. *Miranda* expressly distinguished, on the facts, another seminal causation

case, *Sarti v. Salt Creek* (2008) 167 Cal.App.4th 1187 (*Sarti*). *Sarti* addressed the question whether a bacterial infection experienced by the plaintiff in that case was attributable to a restaurant meal the plaintiff had previously eaten. We conclude the present case is more analogous to *Sarti* than to *Miranda*. The trial court erred in granting summary judgment under *Miranda*. Accordingly, we reverse the judgment and remand for further proceedings.

### C.    *Miranda* **and** *Sarti*

As mentioned, the trial court relied on *Miranda* for purposes of granting summary judgment in this case. However, *Miranda* is, in fact, distinguishable from the present matter. To show why this is the case, we will take a close look at both *Miranda* and *Sarti*.

In *Miranda*, the defendants, a construction company and an excavation company, excavated approximately 1,600 cubic yards of dirt from an area in Southern California, and deposited it in a vacant lot 10-15 feet from a locksmith shop at which Rudy Miranda worked. (*Miranda*, *supra*, 187 Cal.App.4th at p. 1328.) Three months later, Rudy Miranda began exhibiting symptoms of Valley Fever, the existence of which was confirmed by a pathology report. (*Id*. at p. 1329) Rudy Miranda underwent surgery to remove a portion of one lung. (*Ibid*.) Rudy Miranda and his wife, Donna Miranda (referred to collectively and in the singular as Miranda) brought an action with claims for negligence and loss of consortium against the construction and excavation companies. (*Ibid*.) Miranda alleged the defendants dumped a huge dirt pile in the vacant lot and then failed to water, cover, or otherwise control for dust in that dirt pile, and this breach of duty resulted in Miranda's injury. (*Ibid*.)

The defendants filed motions for summary judgment. They adduced an expert declaration from an industrial hygienist to the effect Valley Fever (coccidioidomycosis) was caused by inhalation of airborne spores of the *Cocci* fungus that was endemic to a large portion of California. (*Miranda*, *supra*, 187 Cal.App.4th at pp. 1329-1330.) The

25.

expert declaration adduced by the defendants emphasized that not only was the *Cocci* fungus endemic in many parts of the state, including Southern California, but the *Cocci* fungus, specifically, had been known in a particular instance, to have been carried by strong winds for hundreds of kilometers over a large part of the state. (*Id*. at pp. 1329-1330.) In addition, various everyday activities such as "agricultural work, land development and construction, mining, dusty recreational activities, vehicles on unpaved roads, home gardening, and landscaping," rendered *Cocci* spores airborne. (*Id*. at p. 1329.) The defendants' expert further declared: " 'Since a Valley Fever infection is almost always the direct result of inhalation of airborne spores of the *Cocci* fungus, the exact source (home, recreation, work, travel, etc.) of the exposure cannot be determined absent scientific data, e.g., soils tests, confirming the existence of the *Cocci* fungus in the soil at issue at the time of exposure.' "[3] (*Id*. at p. 1330.) Counsel for one of the defendants submitted a declaration stating Miranda had the opportunity, in connection with his workers' compensation case, to test the soil in the dirt pile within a year of the time the dirt pile was deposited at the vacant lot. (*Id*. at p. 1333.)

Miranda submitted an opposition to the summary judgment motions, with supporting declarations from, among others, two physician experts, each of whom concluded there was a reasonable medical probability that Miranda contracted Valley Fever from a spore originating from the dirt pile. (*Miranda*, *supra*, 187 Cal.App.4th at pp. 1331-1332.) The defendants contended, however, that because Miranda did not have evidence, based on soil tests, that showed the dirt pile adjacent to the locksmith shop actually contained the *Cocci* fungus, the opinions of his physician experts were speculative, and Miranda could not "prove causation as a matter of law." (*Id*. at pp. 1329, 1337.) The trial court agreed with the defendants, excluded the declarations of Miranda's experts, determined there was no triable issue of fact with respect to causation,

---

[3] The industrial hygienist who submitted this expert declaration in *Miranda* was none other than Ben Kollmeyer, who submitted a similar declaration in the instant case.

and granted summary judgment in favor of the defendants. (*Id*. at p. 1334.) The trial court observed that holding the defendants liable for Miranda's injures "would be like holding a gardener liable for allergies caused by pollen." (*Id*. at p. 1334.)

The appellate court (*Miranda*) affirmed the judgment, on grounds, inter alia, that there was no triable issue of fact with respect to causation. (*Miranda*, *supra*, 187 Cal.App.4th at p. 1336.) *Miranda* observed the defendants "met their burden of proving that it was only a *possibility*, not a reasonable medical probability, Miranda contracted Valley Fever by inhaling an airborne *Cocci* spore that originated from the soil [in the dirt pile at issue]." (*Id*. at p. 1336, citing *Jones v. Ortho Pharmaceutical Corp*. (1985) 163 Cal.App.3d 396, 402-403 ["A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was the result of its action."].) *Miranda* further observed that absent scientific data proving the soil in the dirt pile contained *Cocci* fungus, the evidence did not show, by a reasonable medical probability, that the spore that caused Miranda's Valley Fever specifically originated from the dirt pile. (*Miranda*, *supra*, at pp. 1336-1337.)

As for the opinions of Miranda's physician experts, the *Miranda* court noted that "[n]either expert offered an opinion on whether there was a way to medically or scientifically determine the origins of the infecting spore" or "accounted for the undisputed facts showing there were other reasonable and likely sources of the fungus spore causing Miranda's injury." (*Miranda*, *supra*, 187 Cal.App.4th at p. 1337.) *Miranda* pointed out that Miranda's physician experts did not dispute that the *Cocci* fungus grows all over California and that *Cocci* spores become airborne through a variety of activities. (*Ibid*.) *Miranda* concluded that, in light of this undisputed evidence, "the fact [that] Miranda was infected, standing by itself, [did] not create a reasonable inference [that] the dust from [the dirt pile], as opposed to another location, was the source of the disease." (*Ibid*.) Miranda's physician experts were simply indulging in " 'the logical fallacy of "post hoc, ergo propter hoc" (after the fact, therefore because of the

27.

fact).' " (*Id*. at p. 1339.)  Simply put, the *Miranda* court concluded that Miranda could have inhaled the *Cocci* spore anywhere in Southern California, and without more to definitively connect his infection to the dirt pile adjacent to his locksmith shop, the defendants could not be held liable.  (*Id*. at p. 1337.)

In reaching its conclusion, *Miranda* distinguished another seminal California case on causation, *Sarti*, *supra*, 167 Cal.App.4th 1187, in which a woman (Sarti) who suffered a foodborne illness (she was tested positive for campylobacter bacteria) sued a restaurant (Salt Creek Grille) where she had previously eaten a raw tuna appetizer and raw vegetables.  Sarti's bacterial illness escalated into a variant of Guillain-Barré syndrome (a disease that damages peripheral nerves).  (*Id*. at p. 1191.)  The case went to trial and a jury found in Sarti's favor, but the trial court granted the restaurant's motion for judgment notwithstanding the verdict on grounds there had not been an adequate showing as to causation.  (*Id*. at p. 1192.)  The *Sarti* court reversed.

The *Sarti* court highlighted the connection between Sarti's bacterial illness and unsanitary conditions at the defendant restaurant.  "Campylobacter is *not* found in raw tuna, unless that tuna has been cross-contaminated by raw chicken, where the bacteria is common." (*Sarti*, *supra*, 167 Cal.App.4th at p. 1191.)  An investigation by the county health department identified four practices that could have led to cross-contamination of the raw tuna with raw chicken:  wipe-down rags were not regularly sanitized; there was insufficient sanitizer in the dishwasher; chicken tongs were sometimes used to handle other food; and raw vegetables were not stored separately from raw meat.  (*Ibid*.)

There was plenty of evidence in favor of the restaurant.  Sarti went to the restaurant with a friend; the friend shared the raw tuna appetizer but did not get sick.  The Salt Creek Grille took great pains to separate its raw tuna from its raw chicken.  And Sarti worked as a supermarket checker the day she became ill, and could theoretically have picked up campylobacter from a leaking bag of raw chicken she might have scanned at the supermarket.  (*Sarti*, *supra*, 167 Cal.App.4th at pp. 1191-1192.)  However, Sarti

28.

presented expert testimony that made a link between the unsanitary conditions at the restaurant and her campylobacter poisoning; the link was cross-contamination from raw chicken. Sarti had eaten raw tuna and raw vegetables at the restaurant. The use of unsanitized wipe-down rags at the restaurant, the fact that raw vegetables and raw meat were stored together, and the lack of proper sterilization in the dishwasher, all could have resulted in cross-contamination of Sarti's food with raw chicken that had campylobacter present. (*Id*. at p. 1207.)

*Sarti* concluded the circumstantial evidence presented by the plaintiff to connect her illness to eating raw tuna and raw vegetables at the restaurant, was sufficient to permit the jury to reasonably infer the food she ate at the restaurant was contaminated with campylobacter and was the cause of her bacterial illness. (*Sarti*, *supra*, 167 Cal.App.4th at p. 1207.) *Sarti* rejected the restaurant's assertion "Sarti was required, as a matter of law, to exclude all 'possibilities' other than the meal she had at the restaurant." (*Id*. at p. 1210.) Rather, *Sarti* clarified that "California law on causation is 'substantial factor' " and ' "a plaintiff need not 'exclude every other conclusion" ' than the defendant's negligence." (*Id.* at p. 1210, citing *Daugherty v. Lee* (1946) 74 Cal.App.2d 132, 136 [" 'It is not necessary in the trial of civil cases that the circumstances shall establish the negligence of the defendant as the proximate cause of injury with such absolute certainty as to exclude every other conclusion.' "].) Further, to the extent there was a possibility of alternative causes for Sarti's illness, *Sarti* emphasized that the word " 'possibility' " "must necessarily connote something more than bare conceivability or plausibility, otherwise it would swallow up the universe." (*Sarti*, *supra*, 167 Cal.App.4th at p. 1210 [it is "ludicrous" to suggest that attenuated, alternative explanations for Sarti's illness, "must, *as a matter of law*, defeat [her] food poisoning claim"].)

Returning to *Miranda, Miranda* noted *Sarti* confirmed that "[r]easonable inferences drawn from substantial evidence are indeed available to show causation." (*Miranda*, *supra*, 187 Cal.App.4th at p. 1340.) The *Sarti* plaintiff submitted "strong

circumstantial evidence she ate food at a specific restaurant with documented unsanitary conditions" that could permit cross-contamination with raw chicken, a food in which campylobacter is commonly found. (*Miranda*, *supra*, at p. 1342.) Although chicken is available everywhere and chicken at the restaurant was not tested for campylobacter, the jury could "make the reasonable inference there was a causal link between a specific restaurant's unsanitary conditions and [Sarti's] food poisoning." (*Ibid*.) The *Miranda* court then distinguished *Miranda* from *Sarti*: "In contrast [to *Sarti*], Miranda submitted evidence the soil, and sometimes the air, in Southern California is known to contain the pathogen causing his disease. This is evidence from which the jury could link dust inhalation in Southern California and his Valley Fever. However, *there was no circumstantial evidence from which the jury could reasonably infer* [the dirt pile adjacent to Miranda's locksmith shop], as opposed to any other specific dirt pile, was the source of the *Cocci* fungal spore that infected Miranda." (*Ibid*., italics added.)

### D. Analysis

Here, Beebe adduced ample evidence showing that WP&A's Firebaugh Facility was on a migratory route for flocks of swallows that had been nesting at the Facility for years, particularly in the pole barn. Hundreds of swallows would nest there for long periods every year, including the entire time Beebe worked at the Facility. There can be no doubt that the presence of the birds was significant and problematic, given that WP&A personnel made various attempts (some ill-advised) in the relevant time period, to prevent the birds from roosting in the pole barn and other areas of the Facility.

The evidence also showed that the accumulation of bird feces was an extreme problem at the Facility, with some spots having layers of feces an inch or two thick. The accumulations interfered, at times, with the work the Braaten electricians were performing at the site (Beebe himself had to personally remove bird droppings at times). Although efforts were made to dry sweep or use leaf blowers to clear feces off the floor of the pole barn, the feces were simply deposited on the surrounding soil and not

30.

removed from the site. Beebe testified he was not exposed to concentrated accumulations of bird feces anywhere other than the Firebaugh Facility.

While Dr. Chadi Hage, Wonderful's medical expert, attested that histoplasmosis was rare in California, Beebe's infectious diseases expert and treating physician, Dr. Rasha Kuran, who practices in California, disagreed with Dr. Hage's contention as far as the San Joaquin Valley is concerned, based on her experience here. Dr. Kuran also reproduced in her declaration, a map from an academic article, that showed the San Joaquin Valley had a relatively high incidence of H. capsulatum/histoplasmosis. Dr. Kuran noted that people were more likely to contract histoplasmosis during activities in bird habitats or through exposure to concentrated accumulations of bird feces, especially in environments where bird feces were aerosolized. More specifically, it was typically through activities like sweeping droppings, cleaning a chicken coop or roost, or exploring bat caves with exposed droppings that people contracted histoplasmosis.

Furthermore, Dr. Hage testified at deposition that in areas where H. capsulatum is relatively common, if birds had roosted in a particular location for three or more years, that area would likely be contaminated with the fungus. The bird infestation at the pole barn predated the construction projects that began in 2012 and there is no question that swallows had been roosting in the pole barn for several years by the time Beebe wrapped up his work at the Firebaugh Facility. Dr. Kuran explained that "[c]asual exposure to fresh bird droppings or droppings on the sidewalk is not sufficient to cause histoplasmosis"; rather, "[e]xposure that leads to infection" is "usually attained by inhaling disturbed soil that had bird and/or bat droppings for a long time allowing the fungus to grow in that soil."

Ample evidence was also adduced to show that WP&A handled the bird feces in ways that are not recommended from a safety standpoint. WP&A would regularly dry sweep the bird feces off the concrete floor of the pole barn onto the surrounding dirt, where the bird feces reasonably would become concentrated over time and mix with the

31.

soil, as would happen in a chicken coop or bat cave. WP&A also apparently used leaf blowers to clean the floor of the pole barn, that was replete with bird feces by all accounts. In addition, on numerous occasions, the swallow mud nests that lined the ceiling of the pole barn would be scraped off with shovels and left to fall to the concrete floor. It appears the resulting mud and fecal debris (a combination that fosters the growth of H. capsulatum) would either be left there or swept into the surrounding dirt. These methods of handling bird feces would serve to foster proliferation of H. capsulatum and maximize the aerosolization of the feces and mud/soil, as well as the risk of inhalation of any infected feces or infected mud/soil. The construction work occurring at the Firebaugh Facility during the relevant timeframe would also reasonably tend to spur the aerosolization of feces, soil, and dust at the Firebaugh Facility.

Significantly, Beebe lived in an RV near the pole barn during his work at the Firebaugh Facility; even meals were taken in the vicinity of the pole barn on a regular basis. Beebe testified he had begun to feel ill by the end of phase two of the electrical work he performed at the Firebaugh Facility. Robert Simons corroborated Beebe's testimony on this point. Dr. Kuran noted Beebe, like many of her patients, "suffered [a] lengthy period[] of time being undiagnosed." She stated that "[s]ome patients would not necessarily experience chest symptoms initially and go on to develop disseminated infection." She also said: "Mr. Beebe's case falls into the subacute progressive disseminated category, which … typically manifests within 2-24 months of infection." In light of Dr. Kuran's declaration, the timing of Beebe's histoplasmosis diagnosis is consistent with him having acquired it at the Firebaugh Facility.

Conan Dunlap stated in his declaration that WP&A had 12 employees in 2012 and 45 employees in 2014. Not only was the employee pool small, but most people who contract histoplasmosis are asymptomatic, do not seek medical care, and are never diagnosed with the disease. Accordingly, it is not surprising that other workers at the Firebaugh Facility were not diagnosed with histoplasmosis.

32.

The present case is far removed, analytically, from *Miranda*, where "*there was no circumstantial evidence from which the jury could reasonably infer* [the dirt pile adjacent to Miranda's locksmith shop], as opposed to any other specific dirt pile, was the source of the *Cocci* fungal spore that infected Miranda." (*Miranda*, *supra*, 187 Cal.App.4th at p. 1342.) The instant case is more analogous, analytically, to *Sarti*, where circumstantial evidence was sufficient to establish a reasonable inference that the food the plaintiff ate at the Salt Creek Grille restaurant had led to her bacterial infection, given unsanitary conditions there that would have permitted cross-contamination from any raw chicken infected with campylobacter. Just as raw chicken connected Sarti's illness with the restaurant, bird-manure enriched soil connected Beebe's illness to the Firebaugh Facility. Just as raw chicken is commonly infected with campylobacter, bird-manure enriched soils in areas with a relatively high incidence of histoplasmosis are commonly infected with H. capsulatum. Dr. Kuran stated in her declaration that the San Joaquin Valley, including Firebaugh, has a relatively high incidence of histoplasmosis; she adduced a map from an academic article to substantiate her point.

Just as the unsanitary conditions at the restaurant in *Sarti* would reasonably permit cross-contamination from infected raw chicken to occur, dry sweeping and blowing infected bird feces and/or infected mud/soil at the Firebaugh Facility would reasonably permit aerosolization and inhalation of H. capsulatum spores by people at that site. Here, it is undisputed that Beebe lived and worked onsite at the Firebaugh Facility (by the pole barn) for extended periods, in the area where the aerosolized dust was present. Beebe also testified he was not exposed to concentrated accumulations of bird fecal matter elsewhere.

We conclude Beebe has raised a triable issue of material fact as to whether there is a reasonable medical probability that Wonderful's conduct with respect to the birds and bird feces at the Firebaugh Facility was a substantial factor in causing Beebe's illness. (See *Cal. Practice Guide: Personal Injury*, *supra*, ¶ 2:2405 ["the issue is whether it is

33.

*more likely than not* that plaintiff's injury was a result of defendant's act or omission"].) As we noted above, " '[i]t is not necessary in the trial of civil cases that the circumstances shall establish the negligence of the defendant as the proximate cause of injury with such absolute certainty as to exclude every other conclusion.' " (*Daugherty v. Lee*, *supra*, 74 Cal.App.2d at p. 136.) Summary judgment is not warranted here.

### E.    Trial Court's Ruling and Exclusion of Beebe's Experts

The trial court ruled, in granting summary judgment in favor of Wonderful, in part:

> "Defendant argues that absent any scientific data proving the bird droppings were the source of the fungal spores, summary judgment is warranted, as there is no reasonable medical probability the air contained spores of H. capsulatum following Defendants' removal of the droppings. For the sake of argument, unless Plaintiff can demonstrate he has limited his movement to the Firebaugh plant since the conclusion of his work there, Plaintiff's causation contention is implausible. Even so, *without scientific data evidencing the presence of H. capsulatum, Plaintiff cannot demonstrate causation.…* Plaintiff fails to demonstrate there is a triable issue of material fact. The Court finds Dr. Rasha Kuran's declaration speculative and lacking in credibility. [¶]….[¶] The Court … sustains [Defendants'] objections to the Declarations of Train[o]r [and Kuran]."

Beebe challenges the trial court's exclusion of the declarations of Drs. Kuran and Trainor. We review the trial court's rulings on evidentiary objections for abuse of discretion. (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.) As reflected in its ruling, the trial court adopted the reasoning of *Miranda*, *supra*, 187 Cal.App.4th 1326, and on that basis excluded the declarations of Drs. Kuran and Trainor as speculative. As discussed above, *Miranda* is inapposite. There is no basis for excluding the declarations of Drs. Kuran and Trainor as speculative. (See, e.g., *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 [court's discretion "must be exercised within the confines of the applicable legal principles"; it is not unlimited,

especially when "its exercise implicates a party's ability to present its case"].)  We conclude the trial court erred in excluding the declarations of Drs. Kuran and Trainor.[4]

## DISPOSITION

The judgment is reversed.  Beebe is awarded his costs on appeal.

SMITH, J.

WE CONCUR:

DETJEN, Acting P. J.

FRANSON, J.

---

[4]     It is not necessary for us to address Beebe's remaining contentions.